161 So.2d 864 (1964)
D.C. DARTY, Appellant,
v.
STATE of Florida, Appellee.
No. 3257.
District Court of Appeal of Florida. Second District.
March 4, 1964.
*866 J. Hardin Peterson, Lakeland, and William C. Pierce, Tampa, for appellant.
James W. Kynes, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., Tallahassee, for appellee.
WHITE, Judge.
Robert E. Stokes was killed in Polk County, Florida on the afternoon of January 15, 1962 by shots fired from a pistol by D.C. Darty who was indicted and brought to trial. The question was whether the homicide was felonious as charged by the state or self-defensive and justifiable as contended by the defendant. The defendant was found and adjudged guilty of second degree murder on the first degree indictment, and he now submits on appeal that certain incidents of his trial constituted reversible error. These are covered by 31 assignments of error and presented under 11 points on appeal hereafter discussed.
The trial on the whole was well conducted, and both the state and the defendant were ably represented. There were the usual partisan disputes as to certain rulings of the trial court, and a considerable number of points were preserved by objection. There were in fact a few questionable aspects of the trial, but we find that none of them were legally prejudicial to the defendant. There appears no basis for holding that the defendant was denied an essentially fair trial or that the evidence was insufficient to support the verdict.
Most of the factual background was not controversially involved. Defendant D.C. Darty was a 75 year old former peace officer who had served as Chief of Police of the City of Lake Wales for 18 years. In recent years he had a sciatic condition which affected his back and right leg. In 1957 he married Mrs. Catur Clark, a widow whose daughter Pauline was the wife of Robert E. Stokes. Thus the defendant was the step father-in-law of Robert Stokes who was 52 years old at the time of his violent demise. Following the defendant's marriage the relations between the two men were strained. The younger man was openly resentful of the defendant's marriage, and on several occasions he expressed the opinion that the defendant had married Mrs. Clark for her money.
After the defendant's marriage to Mrs. Clark and prior to the day of the shooting, Robert Stokes was reported to have made several threatening statements with reference to the defendant. There is nothing in the record indicating that during this five year interim Robert Stokes made or attempted any physical attack on the defendant. In June, 1957, shortly after his marriage, the defendant was specially deputized and permitted to carry a firearm in view of his report that Robert Stokes had threatened him; and later the defendant moved to another residence in the area ostensibly to avoid living in close proximity to Stokes.
On January 15, 1962 at approximately 3:30 o'clock in the afternoon, Robert Stokes and one Larry Bowen were burning brush on the Clark grove. In the vicinity was Permon Nance, a Negro who was supervising a crew of fruit pickers. W.L. Black was also on the grove in his automobile supervising a crew of men spreading fertilizer. Robert Stokes, according to Permon Nance, walked away from the brush fire carrying his rake and saying to Nance, "Man, I'm going up to get me a drink now, I'm a little on the thirsty side", and walked past Nance; that at this juncture the pickup truck of D.C. Darty approached and *867 stopped close to Stokes, and witness Nance saw Stokes standing by the Darty truck talking with the defendant and leaning on the rake, but Nance did not hear the conversation.
W.L. Black testified that he saw Stokes standing by the truck talking with Darty who remained in the truck; that he, Black, then drove up, parked behind Darty's truck and spoke to Darty. Black testified:
A "And I don't remember just exactly what was said but it was talking about picking of the fruit and putting out fertilizer. And Mr. Darty said, `They supposed to have that fruit off in December and here it is the 15th of January and haven't got it off yet.' And Mr. Stokes he said that `* * * it throwed us about three or four weeks behind with our fertilizer.'
Q "I see.
A "And Mr. Darty said, `Yes, it has.' So Mr. Stokes says, `I'm going to get me a drink of water.' And he walked off and left."
W.B. Black further testified that as Stokes walked away Darty started his truck and headed toward the barn.
Defendant Darty testified in this connection that as he was heading toward the barn Stokes flagged him down; that he, Darty, had been squirrel hunting that forenoon and that he always kept his shotgun in the truck during hunting season; that he was afraid of Stokes and was licensed to carry a pistol because Stokes had threatened him; and he stated that the pistol was next to him on the seat of the truck, together with the shotgun, when Stokes flagged him down. On direct examination the defendant testified:
Q "* * * Who spoke first; what was said?
A "He did.
Q "And what did he say?
A "He said, `are you going to let these people finish this  picking this fruit and their contract out?'
Q "Then what did you say?
A "I said, `I am. I want them to get it done. I want them to get the fruit off of the trees as quick as I can get it.'
Q "And then what did he say?
A "He said, `Get out. I just want to show you how damn crazy they're picking this fruit  picking this grove.'
Q "And then what did you say?
A "Well, I started to get out. I unlatched the door and he stepped back. He had the rake in one hand. He stepped back and taken it in both and I could tell he was mad, his voice was trembling some and I didn't get out, I closed the door and started to drive away. I said that I would see the field foreman before I leave here and see what's wrong.
Q "And then what happened?
A "He said, `Hold on a minute. Did you see Pauline this morning?' Pauline is his wife. I said, `No, sir; I didn't see Pauline. Millie said  Millie's my wife  Millie said she was down at the house but I was not at home.'
Q "Then what was said; what happened?
A "He said, `Well, those people are about to back out on taking that land and we want to sell it.'
Q "And then what happened?
A "I says, `Well, Bob, if Pauline and Millie wants to sell that land on their terms and basis, it's perfectly *868 all right with me. I don't care one way or the other.'
Q "Now relate in your own way just what happened and just 
A "Well, he replied to that and said, `No, you shouldn't care. It's not  it isn't any of your God damn business. That land belongs to us.' And I says, `Well, Bob, that may every bit be true and I had to sign a lot of papers the other evening.'
Q "Then what did he say?
A "He said, `If you have blocked this deal, I'm going to beat your God damned old brains out.'
Q "Then what happened?
A "And I says, `No, you ain't either.'
Q "Then what happened?
A "And he drawed the  he stepped back with one foot a little bit south and drawed the rake back to strike me."
* * * * * *
Q "Then what happened?
A "I went to shooting.

Q "Were you frightened at the time?
A "Yes, sir; I was frightened and scared, too. That rake would scare most anybody.
Q "Did you believe that you were in danger or great bodily harm or death?
A "I knew I was, I felt that I was.
Q "And did you feel that what you did was necessary to protect yourself?
A "I absolutely did, or I wouldn't have did it." (emphasis supplied)
Reverting further to the testimony of the fruit picker Permon Nance, he testified that as he was returning to the grove and approaching the place where Stokes and the defendant were talking he heard shots, looked up and saw Stokes run around toward the rear of the truck in a crouched position, still carrying the rake; that as Stokes reached the rear of the truck he fell over on his back; that he, Nance, hid behind a tree and saw the defendant leave the truck and walk to the rear to look at Stokes; that he thought Darty was carrying what "looked" like a rifle; and that he, Nance, after failing to attract a passing helicopter ran up to Black to inform him what had happened. Black, according to his own testimony, was just stepping out of his car when he heard shots, saw Stokes half bent over run around the truck and fall. Nance ran up saying, "Lord have mercy" * * *. "That man done shot Mr. Bob." Black then drove up and Darty motioned him to stop and said to Black, "I had to shoot him. He was coming on me with a rake."
Another state's witness named Bennie Thomas testified on rebuttal that he heard three shots as he was going from the grove to the water keg. He stated that he saw Stokes' body on the ground and saw the defendant walk from the rear of the truck with a shotgun in his hand. According to the defendant's own version, he did not carry the shotgun to the rear of the truck when he went to look at Stokes; but he stated that he did remove the shotgun from the truck, load it and place it back in the cab. He explained this conduct by saying that he had heard of a person who had shot another in a similar situation and himself had been shot by an irate relative of the victim; and that he, the defendant, loaded the shotgun to protect himself in case of such need.
There was no eye witness to the actual shooting other than the defendant himself. On cross examination of the defendant it was brought out that during the shooting he remained in his truck within the cab, which had small window openings according to the evidence, and that Stokes was standing *869 three or four feet away from the truck when he was shot.
Q "What did he do when he saw you pull the gun and shoot him?
A "He come on down with the rake, but he didn't hit me, he hit the ground right by the corner of the door and then ran.
Q "He was far enough away from you that when he threw the rake down it came down and hit the ground. Is that correct?
A "He made his  he made his lick short. He didn't come on as far as he could have nor as hard, I don't think, as he could have come, either from the shots or the bullets might have stunted him or the shooting might have done it. I didn't know that I had even hit him then.
Q "Well, he must have been a fairly good distance away from you at that time then, wasn't he, Mr. Darty?
A "He weren't any further away than where he was when he went to make that stroke.
Q "But 
A "But he seemed to come down quick  short, didn't come on with the stroke like he was making.
Q "He didn't hit the cab of the truck?
A "No, sir. He hit the ground right by the door, the north part of the door."
The defendant's first point concerns two unanswered questions which were directed to the defendant on cross examination: (1) "And what were the circumstances of your leaving as Chief of Police, Mr. Darty?" Objection to this question was immediately sustained, but defendant's motion for mistrial was denied. Assuming but not deciding that this question was improper under the circumstances, the defendant was not fundamentally prejudiced. The ruling therefore must be sustained. (2) "Have you ever shot anyone prior to this time?" The trial court sustained defendant's objection to this question, admonishing the jury to "disregard the question or any inference therefrom." This is more serious, but it likewise is insufficient to invoke a mistrial by reason of possible unfounded inferences against the defendant. When the defendant took the stand he was subject to a considerable range of cross examination. The prosecution could, for example, have asked him whether or not he had ever been convicted of a felony similar to that for which he was being tried.
The defendant's second point complains of improper inferences and innuendos by references in the indictment to the defendant as a "laborer" and as "late of the County of Polk," and in the state attorney's references to the place of the shooting as the "scene of the crime" and stating his personal "belief," etc. This is an omnibus package designed to stress arguendo that, although each described incident may not be enough in itself to justify reversal, the combined effect was prejudicial to a fair trial. No doubt the occurrences above mentioned are not in harmony with approved methods of prosecution. However, upon serious consideration and weighing the several infractions against the entire record which reflects a general observance of good practice, we hold that the incidents complained of were not of sufficient import to call for a new trial.
The defendant's third point concerns the testimony of Doris Stokes who is not related to the deceased. The State put this witness on the stand after the defense rested, and she testified to a declaration or voluntary statement made by the defendant on the day immediately following the shooting.
Q "Would you tell the gentlemen of the jury what this defendant told you?

*870 A "I went to visit with Mrs. Stokes and I left Mrs. Stokes' home and went to Mr. Darty's home to visit, as I always do when things happen. And we were sitting in the living room talking, and he openly brought up the subject himself. And I complimented him on being so calm, which he was.
"And he said that when some white fellow came up and asked what the trouble was, he said, `You leave him alone. Don't touch him. You just call the Sheriff and my son's office.'
Q "Now when the white man came up, did he state whether or not the white man wanted to help the man on the ground?
A "Yes.
Q "And what did he say he stated to this white man when he came up and wanted to help Mr. Stokes who was 
MR. PETERSON: "We object on the grounds there was was no predicate laid and that it's remote and not part of the res gestae, because I think maybe he's referring maybe to Mr. Black.
THE COURT: "The objection is overruled.
Q "When the white boy wanted to help 
MR. PETERSON: "I beg your pardon; she didn't say white boy. We object. She said white man.
Q "White man. All right. When the white man wanted to help Mr. Stokes lying on the ground, what did Mr. Darty tell you he told him?
A "`Just let the s.b. lay there.'
Q "Mr. Darty told you that he told the man that?
A "Yes, sir."
It is contended that the foregoing interrogation was an attempt to impeach the defendant without laying a predicate as contemplated by Fla. Stat. § 90.10, F.S.A. In other words, it is defendant's position that inasmuch as he had not been questioned about any such statement made by him to Doris Stokes, it was improper for the State to elicit her testimony on the subject. The authorities cited in support of this position disclose that they are not pertinent. Doris Stokes' testimony would have been admissible even though the defendant had not testified in his own behalf. Generally, statements other than confessions of guilt are admissible in evidence against the party making them as admissions against interest, and such a declaration is not rendered inadmissible because of the fact that it was made after commission of the alleged crime. See Jones v. State, 1902, 44 Fla. 74, 32 So. 793; Parrish v. State, 1925, 90 Fla. 25, 105 So. 130; Hulst v. State, 1936, 123 Fla. 315, 166 So. 828; 13 Fla.Jur. Evidence §§ 218, 228, 236, 238.
Doris Stokes' testimony, moreover, was cumulative to that of Larry P. Bowen who was on the scene of the shooting immediately after it occurred. He testified that after the defendant laughingly told him what had happened he, Bowen, started to feel Robert Stokes' pulse but was ordered away by the defendant. Bowen testified:
Q "And he said he didn't know whether he was alive or dead at that time? Is that right?
A "Yes, sir.
Q "And when he ordered you away from him, what did you say then?
A "Well, I asked him had he felt his pulse, to make sure he was dead. *871 I told him I could might  if he was alive I could cradle him in my arms and may save his life, or let him live a little longer, something or other and he just told me to let the son of a bitch lay there."
This testimony tended to show the defendant's state of mind and, as part of the res gestae, it was admissible. Its admissibility is not challenged on appeal. See Thomas v. State, 1943, 152 Fla. 756, 13 So.2d 148.
Defendant's point four submits that it was error to receive in evidence as State's Exhibit No. 7, a purported aerial photograph of the Clark Grove, which photograph was not identified by the person who made it. The point appears to be well taken but, in view of an abundance of other evidence of the physical surroundings at the time and place in question, the admission of said pictorial exhibit is held to be harmless. See Fla. Stat. § 54.23 and § 924.33, F.S.A.
It is urged under defendant's point five that the State's photographic Exhibit No. 10, showing the body of the deceased at the scene of the shooting, was erroneously received in evidence since it could only serve to inflame the minds of the jury. This exhibit shows the deceased on his back and the position of the rake in relation to his body. It was relevant and material to a consideration by the jury of factors other than the fact of death. Mardorff v. State, 1940, 143 Fla. 64, 196 So. 625; Lindberg v. State, 1938, 134 Fla. 786, 184 So. 662.
The defendant's sixth point questions the reception in evidence of a cropped and enlarged photograph apparently showing rake marks on the ground adjacent to the defendant's truck. It is urged that this exhibit, State's exhibit No. 18, does not accurately portray the scene and that it was not made available to the defendant before trial. It appears that the State did furnish the defendant a print of the original photograph, and inasmuch as the truck and the marks of the rake were shown together in the cropped and enlarged picture, there was sufficient photographic perspective to justify its reception in evidence.
The defendant's seventh point complains of the exclusion of eight photographs of the scene of the homicide taken several weeks after the event. It is notable in this connection that during the course of the trial the jury officially viewed the scene. The photographs in question were offered on rebuttal to show, among other things, that the thick foliage of the grove would have made it difficult for the state's witnesses to see what happened at the defendant's truck. It was also urged that the pictures would have supplemented the State's pictures which showed portions of the same area snapped at different angles and, further, that the defendant's pictures would have shown that the deceased had ample room to swing a rake whereas the State's pictures indicated that a tree limb was practically touching the defendant's truck which was in fact nine feet distant; and the defendant submits that even if the proffered pictures were "posed," they nevertheless were admissible, citing Hall v. State, 1919, 78 Fla. 420, 83 So. 513, 8 A.L.R. 1034; Baston v. Shelton, 1943, 152 Fla. 879, 13 So.2d 453, and Mardorff v. State, supra.
We frankly think it would have been proper to receive the defendant's photographs in evidence, although on analysis the question becomes academic. The defendant suggests that his photographs were technically more accurate than those of the State while the State knows of no rule for measuring the admissibility of photographs by comparative accuracy with other photographs of the same area already in evidence. In any event the jury viewed the scene and the proffered photographs were cumulative, so the exclusion thereof was not prejudicial.
The defendant's eighth point complains of the trial court's refusal to *872 give seven of the defendant's twenty-odd requested instructions to the jury. Notwithstanding the absence from the record of distinct grounds[1] of objection to the court's rulings, we have carefully considered the defendant's general protests in the light most favorable to him. We find that the aggregate instructions given by the court amply covered the subjects and equalled or exceeded in liberality to the defendant the charges requested in his behalf. It is settled that a judgment will not be reversed for failure to give a particular charge where, on the whole, the charges as given are clear, comprehensive and correct.
The defendant's ninth point perceives harmful error in the trial court's refusal to excuse certain prospective jurors for cause. We here assume that there was cause for disqualifying the four veniremen who were unsuccessfully challenged by the defendant; but none of these prospects served on the trial jury, and it is not shown that the defendant exercised all his peremptory challenges thereby forcing him to defend against unacceptable jurors. See Young v. State, 1923, 85 Fla. 348, 96 So. 381, 382. The record indicates that the final composition of the jury was entirely acceptable to the State and the defendant.
The defendant asserts under point ten that the trial court erred in overruling his motion to quash the indictment. It is contended that the form of the indictment varies materially from the model or standard form.[2] A review of the language of the indictment discloses that the variances are slight and that the indictment as framed is fundamentally sufficient. See Fla. Stat. § 906.25, F.S.A.
In his final point on appeal the defendant questions the sufficiency of the evidence to sustain the verdict, pointing out that no witness other than the defendant actually saw the shooting and contending that the defendant's version thereof was corroborated by the rake marks resulting from an unsuccessful hostile swing by the deceased. The evidence, however, was susceptible to an inference to the contrary, viz., that the marks resulted only from a normal non-aggressive handling of the rake. It was also within the province of the jury to find that the shooting was not justified in the circumstances even though the deceased might have wielded the rake in a threatening manner. In short, although the defendant was the only eye witness to the shooting, the jury was not required to accept his testimony as absolute truth. His testimony could have been accepted or rejected in whole or in part, depending upon an evaluation of its credibility in the light of attending circumstances established by other evidence.
In weighing the defendant's account of the shooting the jury also had the testimony of Dr. Frank H. Deland, who stated that two bullets entered the body of the deceased in the center of his chest only six centimeters or about two and one half inches apart; that one bullet lodged in the body and the other passed through the body, the bullets entering at a downward angle of about fifteen degrees. From this testimony it could be inferred that the angulation of the bullets squared with the stature of the deceased and the elevation of the defendant sitting in his truck. The picture derived from Dr. Deland's testimony could have tended to refute the defendant's statement that the deceased drew back the rake as though to hit a ball, for the jury might have concluded that if such were the case the bullets would have had a different angulation or would more likely have struck the arms or side of the deceased than in the center of his chest.
In order to justify a homicide on the ground of self defense the situation must be such as to induce a reasonably *873 prudent person to believe that danger was imminent and that there was a real necessity for the taking of life. O'Steen v. State, 1927, 92 Fla. 1062, 111 So. 725. When threats are considered in relation to the defense that the accused killed in self protection, there must be evidence of an overt act which would induce a reasonable belief that the threatened person will lose his life or sustain serious bodily injury unless he immediately takes the life of his adversary. State v. Coles, Fla. 1956, 91 So.2d 200. The law disparages the kind of "self defense" which would subject human life to "the mercy or cowardice or capricious impulse of one whose easily awakened fear prompts him, who is armed with a deadly weapon, to strike upon what at best may be called a hostile demonstration on his victim's part." Collins v. State, 1925, 88 Fla. 578, 102 So. 880, 881.
It was, of course, the function of the jury to determine the credibility of the witnesses and the weight and sufficiency of the evidence. In affirming judgment of conviction in the homicide case of Thomas v. State, 1943, 152 Fla. 756, 13 So.2d 148, 149, the late Justice Terrell concluded:
"In our view, the composite determination of a jury of laymen in a matter of this kind is the most satisfactory method the wit of man has ever devised for ferreting out the truth of such controversies. They are keen analysts of evidence; they are not subsumed by the quibbles and window dressing of procedure; they are actuated rather by a sense of justice and fairness and when let alone will invariably arrive at a righteous result."
When an unlawful homicide is perpetrated without premeditation but by an act imminently dangerous to another, evincing lack of moral sense or a mind reckless of human life, it is murder in the second degree. See Fla. Stat. § 782.04, F.S.A.; Ramsey v. State, 1934, 114 Fla. 766, 154 So. 855; Rivers v. State, 1918, 75 Fla. 401, 404, 78 So. 343. We do not find from the instant record that the verdict of the jury was reached by the avenue of error.
Affirmed.
SHANNON, Acting C.J., and KANNER, J., (RET.), concur.
NOTES
[1] See Fla. Stat. 918.10(4), F.S.A.; Winnemore v. State, Fla.App. 1963, 150 So.2d 277, 280.
[2] Fla. Stat. § 906.05, F.S.A.; Fla. Stat. § 923.03(a), F.S.A.