921 So.2d 708 (2006)
Mark FOWLER, Appellant,
v.
STATE of Florida, Appellee.
No. 2D04-5522.
District Court of Appeal of Florida, Second District.
February 10, 2006.
James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Jonathan P. Hurley, Assistant Attorney General, Tampa, for Appellee.
SILBERMAN, Judge.
Mark Fowler appeals his judgment and sentence for second-degree murder. Because *709 the State failed to rebut Fowler's prima facie case of self-defense, the trial court should have granted Fowler's motion for judgment of acquittal. Therefore, we do not reach Fowler's remaining two points on appeal, and we reverse his judgment and sentence and remand for discharge.
The State charged Fowler with first-degree murder based on the death of Samuel Dunbar on July 22, 2003. Dunbar died from one gunshot wound to the head. No State witnesses testified to the events leading up to the shooting or to the actual shooting. Three witnesses testified that they heard a sound like a firecracker or a gunshot. Telina Nichols was driving down Olive Street at a little after 8:00 p.m. on July 22, 2003, when she heard the shot. She looked around and saw a large man with dreadlocks struggling with a bicycle, and he seemed to be in a hurry. She did not see anything in his hands. When she crossed the intersection, she saw another man lying on his back on the pavement with blood around his head. Nichols called 911.
Pasclovis "Mark" McDonald heard what he thought was a firecracker, and when he went outside and looked, he saw a man lying on his back on the pavement. He also saw a bicycle going down the street, but he could only see the rider's back.
Calvin Standifer testified that he was watching television when he heard the shot. He had been concentrating on the television, but he testified that when he heard the noise he jumped up and went to his window. He saw a man falling backward onto the ground. He also saw, out of the corner of his eye, a man on a bicycle.
During their investigation, the police had telephone contact with an unidentified female who gave them a description of a person and directed them to a residence that was near the location of the shooting. Officers surrounded the residence and instructed whoever was inside to come out. The officers heard crashing noises coming from inside the residence. An officer saw Fowler fling open the back door, and when the officer leveled his shotgun at Fowler and told Fowler to get on the ground, he slammed the door shut. Another officer heard some loud crashing noises and then saw Fowler in the kitchen. He instructed Fowler to come out, and within a minute he did and was taken into custody.
When they entered the residence, the officers found it had no electricity, and they saw holes in the ceiling with attic insulation hanging down. A detective found a knit ski mask in the attic. In the mask were a gun in a holster and a plastic bag containing bullets. A gray Buccaneers t-shirt was found under other items in a cardboard box on the washing machine. The shirt had blood on it.
The forensic evidence showed that the blood on the t-shirt matched the DNA profile of Dunbar's blood sample. A firearms examiner testified that the gun was missing its "cylinder hand." She explained that this would not affect the first shot when there is a live cartridge in the chamber, but for any subsequent firings the cylinder must be rotated manually. Otherwise, the gun will misfire.
Dr. Volnikh, an associate medical examiner, testified that Dunbar was six feet tall and weighed 257 pounds. She stated that he died from a gunshot wound to the forehead. The shot was fired from a distance of at least three to three and a half feet.
At the close of the State's case, Fowler made a motion for judgment of acquittal. The trial court granted the motion as to first-degree murder based on a lack of proof of premeditation but stated that the case could go to the jury as to second-degree murder or manslaughter.
*710 Fowler was the only person to testify as to the events leading up to the shooting and to the actual shooting. He testified that he is Jamaican, thirty-six years old, married, and has three children. He admitted that he had three prior felony convictions. Fowler, his wife, and his children were in the process of moving from their residence to a new apartment on July 22, 2003. The electricity had already been turned off, and he had been packing. He was also working on his truck, but he could not get it started. He was stressed out, so he decided to go buy a "nickel sack," or five dollars worth, of marijuana.
He had $240 in his pocket, which was the deposit money for the new apartment. With five dollars in his hand, he rode his bicycle to a location on Olive Street where he had bought marijuana in the past. Instead of his usual source, "Slim," Fowler encountered a stranger who was a large, well-built man (later identified as Dunbar). Dunbar had what looked like a piece of crack cocaine in his hand, and Fowler asked where Slim was and said that he wanted to buy a nickel bag of weed. Dunbar balked at the small amount, and Fowler, who was straddling his bicycle, said he would go to the "hood" to get what he wanted. Dunbar then said that he would sell a "dime."
Fowler testified that Dunbar approached closer, and he saw Dunbar holding a black bag. Fowler sensed from the look on Dunbar's face that something was not right. Dunbar had his right hand inside the bag, and his left hand on top of the bag. Fowler then recognized that the bag was actually a ski mask. The mask was hanging down and elongated like something was in it. Dunbar stuck the barrel of a gun through one of the holes and, using a racial epithet, told Fowler that he was going to rob him.
Fowler stated that Dunbar put the gun to Fowler's face and cocked it. Dunbar said that he did not like "cross water niggers," which Fowler understood to mean Dunbar did not like Jamaicans or foreigners. Fowler was terrified for his life and thought he was going to die. Dunbar moved the gun down to Fowler's side as Fowler reached into his pocket to get money. When Dunbar was distracted by a passing car, Fowler swung his arm, hitting the gun from Dunbar's hand, and he grabbed the gun and pulled it through the ski mask hole. While Fowler grabbed the gun, the bicycle slid to the side and was falling down between his legs. Dunbar was looking in the mask, which he still held in his hand, and Fowler testified that it looked like there was something still in the mask because it looked like it was weighted down. Fowler testified that he could not have easily pedaled away because the bike had fallen down between his legs.
Fowler pointed the cocked gun at Dunbar but said he did not have his finger on the trigger. Dunbar took a few steps away, then turned back towards Fowler. Dunbar then said, "Fuck this shit," and charged at Fowler, like a football player going to make a tackle. Fowler did not have a chance to say anything. He said he then touched the trigger and a shot went off. He estimated that Dunbar was six to eight feet from him when he started to charge him and about halfway to him when the shot was fired. Fowler did not know if Dunbar was hit, but Dunbar came crashing into his arm and grabbed his shirt. Fowler did not know if Dunbar had another weapon in the mask. Fowler squeezed the trigger again, but the gun did not fire. Fowler reached down to grab the mask that had fallen, and then he saw that Dunbar was just standing there with blood on his face. Fowler picked up his bike, got back on it, and pedaled away.
*711 Fowler rode straight home and vomited. He realized that he still had the gun and mask and threw them in the attic. He vomited again, and he testified that he called his wife for her to come home. He did not want to tell her what had happened over the phone, but he stated that when his wife came home he would tell her. He wanted to wait for her before calling the police.
Fowler testified that he was scared, nervous, upset, and feeling sick. When the police arrived, he started to go out the back door, but then he shut the door. He admitted that he was not thinking straight. He decided to get the gun out of the attic so the police would not think he was hiding it, but the attic was dark and his foot went through the floor. He heard the police calling for him to come out. After his foot went through the floor again, he came down out of the attic, and the police took him into custody.
The defense also presented Leroy Parker, a supervisor with the Florida Department of Law Enforcement (FDLE) and an expert in bloodstain pattern analysis. Parker testified that the blood stains on Fowler's t-shirt were contact stains. He concluded that a bloody object came into contact with Fowler's shirt. Parker opined that none of the stains were velocity stains or "blow back."
The evidence also showed that Dunbar had crack cocaine and two bags of marijuana on his person at the time of the shooting. A toxicology report showed that Dunbar's urine contained cocaine and benzoylecgonine, a substance that is produced when cocaine is metabolized by the body. His blood also contained benzoylecgonine.
At the close of all the evidence, the defense renewed the motion for judgment of acquittal as to second-degree murder. The defense also argued that because the State failed to rebut Fowler's testimony that he shot Dunbar in self-defense, Fowler was entitled to be discharged. The trial court denied the motion, and the jury returned a verdict of guilty of second-degree murder. The trial court also denied Fowler's motion for new trial and for a postverdict judgment of acquittal. The trial court imposed a mandatory minimum sentence of twenty-five years.
Our standard of review on the denial of a motion for judgment of acquittal is de novo. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). The State must prove the defendant's guilt beyond a reasonable doubt, and when the defendant presents a prima facie case of self-defense, the State's burden includes "`proving beyond a reasonable doubt that the defendant did not act in self-defense.'" Thompson v. State, 552 So.2d 264, 266 (Fla. 2d DCA 1989) (quoting Hernandez Ramos v. State, 496 So.2d 837, 838 (Fla. 2d DCA 1986)). In Brown v. State, 454 So.2d 596, 598 (Fla. 5th DCA 1984), superseded by statute on other grounds as stated in Thomas v. State, 918 So.2d 327 (Fla. 1st DCA 2005), the court explained as follows:
While the defendant may have the burden of going forward with evidence of self-defense, the burden of proving guilt beyond a reasonable doubt never shifts from the State, and this standard broadly includes the requirement that the State prove that the defendant did not act in self-defense beyond a reasonable doubt.
We recognize that the question of whether a defendant committed a homicide in justifiable self-defense is ordinarily one for the jury. Id. However, when the State's evidence is legally insufficient to rebut the defendant's testimony establishing self-defense, the court must grant a motion for judgment of acquittal. State v. Rivera, 719 So.2d 335, 337 (Fla. 5th DCA *712 1998); Sneed v. State, 580 So.2d 169, 170 (Fla. 4th DCA 1991). In Sneed, the court concluded that a motion for judgment of acquittal should have been granted when "the state's evidence was legally insufficient to prove guilt beyond a reasonable doubt, because the state failed to rebut the defendant's direct testimony that he acted in self-defense and, in fact, some of the state's evidence corroborated defendant's testimony of self-defense." 580 So.2d at 170 (quoting Hernandez Ramos, 496 So.2d at 838). Like Sneed, in this case there were no eyewitnesses to the shooting.
In Fowler v. State, 492 So.2d 1344, 1352 (Fla. 1st DCA 1986),[1] the First District reversed a murder conviction because "the defendant's hypothesis that the shooting was purely accidental and in self-defense has not been overcome." As in the present case, no eyewitnesses saw the shooting or the events preceding it, and the defendant fled after the shooting. In fact, in Fowler, the defendant fled the jurisdiction. In discussing whether the State met its burden to withstand a motion for judgment of acquittal, the court stated, "Evidence that leaves room for two or more inferences of fact, at least one of which is consistent with the defendant's hypothesis of innocence, is not legally sufficient to make a case for the jury." Id. at 1348.
Here, the State argues that evidence of Fowler's flight after the shooting shows consciousness of guilt and is inconsistent with his theory that he acted in self-defense. The State cites Sims v. State, 681 So.2d 1112 (Fla.1996), to support its argument that evidence of the defendant's flight after a shooting is sufficient to rebut evidence of self-defense. In Sims, the defendant shot a law enforcement officer, threw the gun in a river, and arrived by bus four days later in California. In addition to the defendant's actions after the shooting, however, the court noted that the physical evidence, as testified to by the firearms expert and medical examiner, was inconsistent with the defendant's version of events. Further, the defendant's version of events was inconsistent with the testimony of three other witnesses. Id. at 1116. Sims is distinguishable from the present case because here, the evidence was not inconsistent with Fowler's version of events.
While flight can evidence consciousness of guilt, it is not inconsistent with Fowler's hypothesis that he fled because he was panicked, scared, and not using good judgment. In Fowler, the court stated as follows:
We do not doubt that the evidence adduced by the state, particularly the evidence as to Fowler's actions after the shooting, casts considerable suspicion upon him. But mere "suspicion" is not enough. When the state presents circumstantial evidence of a particular fact which is arguably consistent with the defendant's story, then the fact is simply not probative of the defendant's guilt.
492 So.2d at 1350 (citations omitted).
Here, in opposing Fowler's motion for judgment of acquittal at the close of all the evidence, the prosecutor relied on (1) the testimony of Calvin Standifer and (2) Fowler's behavior after the shooting. With respect to Standifer's testimony, nothing in his testimony contradicts the defense evidence that Fowler acted in self-defense. Standifer testified that he was watching television when he heard the gunshot and that he immediately went to the window and saw Dunbar falling backward. The State contends that if Fowler's version of events is correct, then when Standifer went to the window he would *713 have seen Dunbar falling into Fowler before falling backwards to the ground. First, although Standifer acknowledged that he jumped up immediately, nothing reflects how far Standifer's chair was from the window or how long it took him to get to the window. Fowler's testimony established that the events all happened very quickly, and a reasonable explanation as to what Standifer saw is that by the time he got up and went to the window, Dunbar had already fallen against Fowler and was falling backwards to the ground.
Furthermore, the physical evidence is consistent with Fowler's explanation that Dunbar fell against him before falling to the ground. The FDLE serologist testified that the blood stains on Fowler's shirt matched the DNA profile of Dunbar's blood sample. Leroy Parker, a supervisor for the FDLE and an expert in the field of bloodstain pattern analysis, testified that all of the blood stains on Fowler's t-shirt were contact stains and that they were not "blow back" stains. Thus, the physical evidence supports Fowler's testimony that Dunbar fell against him, and then Dunbar fell to the ground. Standifer's testimony that he only saw Dunbar falling backward does not contradict Fowler's testimony and the physical evidence.
With respect to Fowler's behavior after the shooting, the prosecutor stated, "The consciousness of guilt of fleeing the scene, of hiding the gun and his behavior thereafter clearly indicate that he did not handle the situation properly." We agree that Fowler did not handle the situation properly. Although his actions could show consciousness of guilt, his actions are also consistent with someone who exercised poor judgment and panicked. After all, Fowler was in a high crime neighborhood, he has a prior felony record, and he had gone to the area where Dunbar was located to purchase marijuana. He admitted that he used poor judgment, and he testified that he was not thinking straight after the shooting and that by the time he returned home he was physically sick and vomiting. As Fowler argues on appeal, his actions "were consistent with fear, panic, impaired thinking, and, perhaps based on his background, a sinking feeling that the police would not believe him." Thus, we conclude that the State's evidence of Fowler's actions after the shooting does not rebut his prima facie case of self-defense.
In Fowler, 492 So.2d at 1346, the First District observed as follows:
The inability of the state to articulate an understandable theory of the evidence that contradicts Fowler's explanation and excludes his hypothesis of innocence leads us to conclude, after detailed study of the record, that the evidence is legally insufficient to support the judgment of conviction entered by the trial court.
Similarly, here the State has offered no understandable theory of evidence that contradicts Fowler's explanation of self-defense. In fact, in responding to the motion for judgment of acquittal at the close of the State's case, the prosecutor acknowledged that "there's no indication of a reason for this happening." Fowler presented a prima facie case of self-defense, and the State simply did not carry its burden to rebut the claim of self-defense and to prove Fowler's guilt beyond a reasonable doubt. Therefore, we reverse Fowler's judgment and sentence and remand for discharge.
Reversed and remanded.
VILLANTI and WALLACE, JJ., concur.
NOTES
[1] The defendant in that case was Larry Fowler, not Mark Fowler.