SILBERMAN, Chief Judge.
Tamra Suzanne Leasure was convicted of second-degree murder and sentenced to thirty years in prison after she shot and killed Arthur Tilley. Leasure argues that the trial court erred in denying her motion to dismiss the charge pursuant to section 776.032(1), Florida Statutes (2008), which is known as the “Stand Your Ground” law. She alternatively argues that the court erred in denying her motion for judgment of acquittal. We find no error in these rulings and affirm.
I. Facts
A. The Couple Meets at the Peabody Hotel: January 2009
At the time of the crime, Leasure was a forty-three-year-old single mother of a twelve-year-old son and a fourteen-year-old daughter. Leasure ran a home-based business through which she sold promotional products. In early January 2009, Leasure took her son, daughter, and her daughter’s boyfriend to Orlando to attend a trade show. At lunchtime, Leasure took *8 the children to the Peabody Hotel. Leas-ure sat at the bar and engaged in conversation with Tilley, a businessman in his mid-fifties from Maine.
Tilley told Leasure that he had come to town to purchase the Peabody. Leasure and Tilley spent some time talking, and Leasure thought she might be able to do some business with Tilley. Tilley offered to take Leasure and the children sightseeing and shopping for the afternoon. He also offered for them to spend the night in his three-bedroom suite at the Peabody. Leasure agreed.
During the course of the evening, Leas-ure discovered that Tilley was a very heavy drinker. When Leasure asked why he was drinking so much, Tilley simply replied that he was on vacation. At some point during the evening, Tilley gave Leas-ure an Irish wedding ring. When Leasure accepted the ring, Tilley declared that they were engaged. Leasure did not take him seriously.
The next morning, Leasure and Tilley were having breakfast at the hotel restaurant when several police officers arrested Tilley. Leasure did not stay to learn the details of the arrest; she gathered the children together and left the hotel. Tilley contacted Leasure from Maine several days later and explained away the arrest. The pair resumed their relationship via telephone.
B. Tilley Returns to Florida to Visit Leasure: February 2009
Leasure started to have feelings for Til-ley, and he returned to Florida to see her on February 17. Tilley flew into Tampa International Airport, and Leasure met him in the bar of the airport Marriott. Tilley confided that he could not check in at the Marriott because his mother had cancelled his credit cards. Tilley had contracted cirrhosis of the liver from his excessive drinking, and he had promised his mother that he would go to rehab. His mother was upset that he had flown to Florida to see Leasure instead. Leasure invited Tilley to spend the night at her house in Riverview.
Tilley stayed with Leasure on and off for about two weeks. Tilley was able to withdraw cash from the bank, and he alternated his time at the Marriott. Tilley showered Leasure and her friends and family with presents. He declared that he was going to marry Leasure, but Leasure rebuffed his entreaties. Tilley continued to drink excessively, and his demeanor became volatile, changing from kind to cantankerous as the day progressed. The relationship deteriorated. Tilley was scheduled to fly back to Maine on March 6, and Leasure eventually told him that she did not want to see him again after he left.
C. The Relationship Ends with a Shooting: March 4-5, 2009
On March 4, Leasure spent the night at the home of another man. She left her cell phone at her home, and she did not call Tilley all night. Tilley panicked when she did not return home and became convinced she had been arrested or involved in a car accident. He used Leasure’s cell phone to call several hospitals looking for her. At 2:00 a.m., Tilley woke up Leas-ure’s daughter to share his concerns. Leasure did not return home until around 8:00 a.m. the next morning. By that time, Tilley, who had been drinking, was pacing back and forth in the driveway with his packed suitcase in hand. Leasure told Tilley that her car had broken down and she had spent the night in the car.
Leasure’s employee, Jennifer Prochaska, arrived at Leasure’s home to start her workday shortly thereafter. The two spent some time discussing the day’s *9 schedule outside. When they walked inside, Tilley was still upset. He grabbed a plastic bag and some duct tape, put the bag over his head, and said he was going to kill himself because he had no reason to live. Leasure did not take him seriously.
Leasure and Prochaska had a business meeting scheduled at a restaurant in Tampa at noon. On the way there, they dropped Tilley off at a home improvement store. He took a cab back to Leasure’s home, stopping at a liquor store on the way. At the restaurant, Leasure had lunch and a few drinks. During the meeting, which lasted most of the afternoon, Tilley called Leasure on her cell phone over a dozen times.
Leasure and Prochaska returned to Leasure’s home at around 5:00 p.m. Tilley was still upset that Leasure had stayed out the previous night. Prochaska left at about 6:00 p.m. Approximately two hours later, Tilley was shot three times with a revolver in Leasure’s kitchen. He died almost immediately.
D. Leasure Lies to Explain the Shooting: March 5-6, 2009
Leasure called 9-1-1 at 8:16 p.m. She initially told the operator that she shot Tilley in the head after he attacked her. Moments later, she changed her story and said she grabbed the gun from Tilley and it accidently went off. Finally, she asserted that Tilley had shot himself in the head and then pointed the gun at her.
Deputy DeLuna responded to the 9-1-1 call. When he entered the kitchen, he saw Tilley on the floor. Tilley was lying on his right side in a pool of blood. The deputy noticed that a revolver appeared to have been placed in Tilley’s outstretched hand. There were no signs of struggle in the home. The deputy went outside to secure the crime scene. He noticed Leasure sitting on the porch and muttering to herself. She was repeating the version of the shooting that she would relate to the detectives.
Detectives Harris and Garcia arrived and interviewed Leasure in Detective Harris’s car at 10:22 p.m. During the interview, which was recorded, Leasure described the events of that day. She said she and Prochaska had dropped Tilley off at the home improvement store and had gone to a business meeting. She explained that she had come home and taken a nap but was awakened by her cell phone. When Leasure returned the missed call, she learned that Tilley had been calling hospitals looking for her the previous night. But Leasure did not tell the detectives she had spent the night at the home of another man; she said she was delayed for an hour when her car battery died.
Leasure explained that she confronted Tilley in the kitchen and he became upset. He was also extremely intoxicated. She claimed that Tilley pulled out a gun and said, “I’m going to put myself and you out of your misery.” He shot himself in the forehead and then pointed the gun at Leasure. Tilley told her, “We’re going to go to heaven and get married together. You’re going to die with me.” Leasure grabbed the gun and shot him in the chest. Tilley “moved again” and “was grabbing at” Leasure, so she shot him again. Leas-ure panicked and placed the gun in his hand. Then she called 9-1-1.
Throughout the interview, Leasure repeatedly referred to Tilley as a nice person. When asked about previous disagreements, Leasure said that they did not have any aggressive conflicts but that Tilley would get drunk and not “make sense.” Leasure was not afraid of Tilley, but his drunkenness had started to annoy her.
The detectives then interviewed Leas-ure’s son and daughter, who had arrived *10 on the scene after the shooting. After consulting with the detective in charge of the scene and the scene investigators, the detectives reinterviewed Leasure in her home at 2:47 a.m. This interview was also recorded.
The detectives explained that there were some serious inconsistencies between the evidence and Leasure’s version of events. They asked her to tell them the truth about what happened. Leasure restarted her narrative. She said that when she got home, Tilley had his bags packed and was drunk and belligerent. Detective Harris interrupted and asked Leasure what time she got home the prior evening. Leasure responded that she did not get home until 8:00 a.m. the following morning. The detectives reminded Leasure that she had told them she was only gone an hour the previous evening, and she responded that she was “really shook up.” Leasure said that her car battery died and she spent the night on the side of the road.
Leasure reiterated her original narrative from the point when Prochaska arrived. When Leasure finished, the detectives asked whether she owned a gun. Leasure said no. Detective Harris then revealed that Leasure’s son had told them she owned a revolver. Leasure vehemently denied it. But Detective Harris further explained that Leasure’s son had described the weapon police found in Tilley’s hand “to a tee” without having seen it. Detective Harris told Leasure that he knew that it was her gun and would eventually confirm it. Leasure continued to deny owning the gun. Detective Harris continued pressing Leasure, and she finally admitted that the gun was hers. She said that she kept it under her mattress.
Detective Harris asked Leasure if her previous story was accurate with the exception that she knew where Tilley got the gun. Leasure replied that it was. Detective Garcia then told Leasure that he could tell she was not telling the truth based on her body language. He implored Leasure to “come completely clean with it.”
Leasure asserted that she had no idea how Tilley got her gun from under the mattress. Then she retold her story from the point when Tilley pulled out the gun in the kitchen to the point when Tilley shot himself in the head. The detectives confronted Leasure with the impossibility of Tilley shooting himself the way she described based on the physical evidence. Leasure adhered to her story, but the detectives refused to believe her. Finally, she admitted that she grabbed the gun from Tilley and shot him in the head. Leasure said Tilley came at her so she fired the gun two more times.
In response to these statements, Detective Harris acknowledged that Leasure’s story was starting to make more sense. However, he said he knew that Tilley never had the gun because Tilley’s fingerprints were not found on it. Leasure stuck with her story, but the detectives persisted in asserting that Tilley never had the gun. Leasure then changed her story yet again and admitted that she retrieved the gun from underneath her mattress. She claimed she did so because she felt threatened.
Detective Harris asked Leasure to “explain how he was threatening you to make you to where you felt like you had to go retrieve your weapon.” Leasure responded that Tilley was threatening to kill her and then commit suicide. Detective Harris asked what he was going to use to kill her when he did not have a gun. Leasure responded that she did not know.
Leasure said she was frantic. She ran into the bedroom, and Tilley followed “hot on her heels.” She grabbed the gun from under the mattress and backed Tilley out *11 of the bedroom. At this point, Detective Harris was losing his patience. He confronted Leasure with evidence that the holster that held the gun had been carefully placed on the bedroom nightstand. Leasure responded, “That’s where it landed.” When confronted with the unlikelihood of the holster landing in such a manner, Leasure suggested that she may have placed the holster on the nightstand after the shooting. But she maintained her story that she ran into her room with Tilley chasing after her. Detective Harris explained why he did not believe Leasure:
I wish — I wish you realized how ridiculous that sounds. I really do. I really wish you — you would really take that in — and just see how ridiculous that sounds. For someone who is scared for their life, of being beaten with someone’s bare hands — okay? A five foot, six, little dude — okay—is going to chase you down and beat you to death with his bare hands wit — with cirrhosis [of the] liver and all this kind of stuff.
The detectives also said they did not understand why Leasure was afraid for her life because the couple had no history of violence. Leasure responded by asserting for the first time that Tilley had been physical with her by shoving and hitting her. Detective Harris noted that Leas-ure’s person did not show any physical signs of a struggle and that she did not “look beaten or battered.” Leasure said that Tilley had been “extremely aggressive, extremely angry.” Detective Garcia asked if Tilley was angry because she had been out the previous night and then asked, “Where were you last night? And don’t — I mean, don’t tell me the battery thing.” Leasure maintained that she had spent the night in her car on the side of the road after her battery died.
The detectives returned to the subject of the argument that led Tilley to threaten Leasure’s life. Leasure said that Tilley was mad because he had to return to Maine to go into rehab without her the next day. She added that Tilley asked her to stay at the Marriott with him for their last night together but she refused. Leas-ure offered to drop him off at the airport, and Tilley went crazy. He started choking her. Detective Garcia indicated that he was unhappy hearing yet another version of events at this point in the interview. When Leasure started repeating how Til-ley continued to threaten her even as she held him at gunpoint, the detectives ended the interview.
E. Leasure is Tried for Murder: February 2011
Leasure testified at the Stand Your Ground hearing and at trial that she spent the night before the shooting at the home of another man. She otherwise set forth the events leading up to her final confrontation with Tilley in a manner consistent with her story as it evolved during her second interview. Leasure testified that Tilley threatened to kill her and was coming at her and shoving her. Leasure explained that she was six to seven inches taller than Tilley and she weighed about 130 pounds to his 146. She was in better physical condition, so she was able to skirt around him to get into the bedroom to get her gun. Although Leasure had told the detectives that Tilley chased her into the bedroom and was “hot on my heels,” she admitted that this was one of several “unfortunate lies” she told the officers.
Leasure said she backed Tilley out of the room into the kitchen at gunpoint. But he grabbed the gun, and they wrestled over it. She then shot him in the head, but he kept threatening her and waving his arms at her. So she shot him two more times in rapid succession. At the Stand Your Ground hearing, Leasure did *12 not know whether she shot Tilley as he was falling or as he was lying on the kitchen floor. She testified that “it happened in such quick succession, he could’ve been laying [sic] on my floor. But I have a feeling — to me, he was still reaching and falling.” At trial, Leasure insisted that she shot Tilley as he was falling. Leasure testified that, after she shot Tilley, she panicked. She placed the gun in Tilley’s hand, and then she kept lying to cover up this initial lie.
Dr. Laura Hair, the medical examiner, testified that Tilley suffered three bullet wounds: a graze wound to his head, a wound to his neck, and a wound to his torso. The graze wound to Tilley’s head occurred first. The shot was fired from a distance of between several inches and four feet. Dr. Hair was not absolutely certain of the order of the second and third shots, but she believed that the second bullet was the one that entered the left side of Tilley’s neck. This shot fractured a cervical vertebra and would have rendered Tilley a quadriplegic immediately. Tilley would have fallen to the ground and would not have been able to reach towards Leasure. She believed that the third bullet entered Tilley’s torso just below the rib cage. The bullet struck Til-ley’s heart and would have resulted in his immediate death. The bullet appeared to have entered Tilley’s body as he was lying on the floor on his right side. The second and third shots would have been fired from four or more feet away.
On cross-examination, Dr. Hair acknowledged that she could not definitively rule out self-defense. But she said she would not be able to rule out self-defense of any gunshot victim unless the victim was tied up and shot in the back of the head. It was possible that Leasure shot Tilley in rapid succession and Tilley was falling when the torso shot entered his side. But, based on the upward trajectory of the bullet, the shooter would have fired the shot from somewhere below Tilley. Dr. Hair confirmed that Tilley had been drinking heavily the day of the shooting and had a blood alcohol level of .23. Tilley also had severe cirrhosis of the liver.
II. Motion to Dismiss
Prior to trial, Leasure filed a motion to dismiss in which she alleged that she was immune from criminal prosecution under Florida’s Stand Your Ground law because she acted in self-defense. The Stand Your Ground law is codified in section 776.032(1) and grants criminal immunity to persons using force as authorized in sections 776.012, 776.013, or 776.031. Sections 776.012(1) and 776.013(3) authorize the use of deadly force based on a reasonable belief that it is necessary to prevent great bodily harm or death. A defendant must establish entitlement to immunity by a preponderance of the evidence. Horn v. State, 17 So.3d 836, 839 (Fla. 2d DCA 2009).
In denying Leasure’s motion to dismiss the trial court held:
The main evidence against the Defendant is the series of inconsistencies [sic] statements she made to the police, which contradict her theory of self-defense. Additionally, the medical evidence contradicts the Defendant’s version of the events. The court concludes the defense has not convinced the court beyond a preponderance of the evidence that immunity has been proven here. The Defendant’s motion is therefore denied.
We review the trial court’s legal findings de novo, and we review the findings of fact for competent, substantial evidence. See Hair v. State, 17 So.3d 804, 805 (Fla. 1st DCA 2009), review denied, 60 So.3d 1055 (Fla.2011).
*13 Leasure argues that the trial court erred in denying her motion to dismiss because she proved by a preponderance of the evidence that she reasonably believed it was necessary to use deadly force to prevent death or great bodily harm. Leasure relies on her testimony that she shot Tilley after he came at her and attempted to take the gun she was holding to carry out his threats to kill her. She claims that she met her burden of proof because the State offered no other motive for the shooting.
However, we agree with the trial court that, because of the myriad of inconsistencies in her statements and the inconsistent medical evidence, Leasure failed to prove entitlement to immunity by a preponderance of the evidence.[1] Leasure related several inconsistent versions of events before settling on the testimony she related at the Stand Your Ground hearing. And her testimony that, after the first shot grazed Tilley’s head, she shot Tilley two times in rapid succession as he came at her was contradicted by Dr. Hair’s testimony. Dr. Hair testified that the third shot had to have been fired from above Tilley as he lay on the ground or from below Tilley as he was falling. Leasure denied standing over Tilley and shooting, and she stood at least seven inches taller than Tilley.
This evidence supported the trial court’s findings that Leasure’s claims were inconsistent and contradictory, and, therefore, did not establish entitlement to immunity. We agree that Leasure did not meet her burden of proving that she reasonably believed it was necessary to use deadly force to prevent Tilley from inflicting death or great bodily harm. Accordingly, the trial court did not err in denying Leasure’s motion to dismiss.
III. Motion for Judgment of Acquittal-Self-Defense
At trial, Leasure raised two separate arguments in support.of her motion for judgment of acquittal. First, she asserted that the State failed to rebut her claim of self-defense. Second, she asserted that the State failed to prove that she acted with the requisite intent. We will address these arguments in turn using a de novo standard of review. See Stieh v. State, 67 So.3d 275, 278 (Fla. 2d DCA 2011).
When a defendant claims self-defense, she bears the initial burden of presenting a prima facie case of self-defense. Id. Once she does so, the burden shifts to the State to prove that the defendant did not act in self-defense beyond a reasonable doubt. The State may present such evidence “through rebuttal witnesses or by inference in its case-in-chief.” Id.
 The first question on this issue is whether Leasure presented a prima facie case of self-defense. Under section 776.013(3), a person is justified in using deadly force when that person (1) is attacked in a place where she has a right to be, (2) is not engaged in any unlawful activity, and (3) reasonably believes it is necessary to use force to prevent death or great bodily harm. The first two factors are not at issue. As to the third factor, Leasure testified that she armed herself because Tilley threatened to kill her and was coming at her and shoving her. Leas-ure said she backed Tilley into her kitchen at gunpoint. He grabbed the gun, and they wrestled over it. She shot him in the *14 head, but he kept threatening her and coming at her. So she shot him two more times in rapid succession. This evidence established a prima facie case of self-defense.
The second question on this issue is whether the State presented sufficient evidence to rebut Leasure’s testimony that she acted in self-defense. Leasure claims that the State failed to meet its burden because there were no eyewitnesses to contradict Leasure’s testimony and the medical evidence did not contradict her testimony. She argues that her inconsistent statements to the police were nothing more than the use of “extremely poor judgment” after she panicked.
However, even when there are no other witnesses to the events besides the defendant, a jury is not required to accept the defendant’s testimony in support of her self-defense theory as true. See Darty v. State, 161 So.2d 864, 872 (Fla. 2d DCA 1964), disagreed with on other grounds by Swafford v. State, 533 So.2d 270 (Fla.1988); Teague v. State, 390 So.2d 405, 406 (Fla. 5th DCA 1980). Instead, it must consider the probability or improbability of the defendant’s credibility in light of the circumstances established by other evidence. See Darty, 161 So.2d at 872; Teague, 390 So.2d at 406-07.
Leasure’s numerous inconsistent statements to the 9-1-1 operator and then to Detectives Harris and Garcia cast significant doubt on her assertions that she had a reasonable fear of death or great bodily harm. Initially, Leasure told the 9-1-1 operator three different stories, including that she shot Tilley to protect herself, that she shot him accidentally, and that he shot himself. To the detectives, Leasure first asserted that she was afraid because Tilley pulled out a gun and threatened her life. Then the detectives confronted Leas-ure with irrefutable evidence that the gun was hers, and she shifted gears slightly and said that Tilley must have retrieved the gun from under her mattress. After further prodding, Leasure finally admitted that she retrieved the gun. At first, she asserted that she did so because she was “frantic” and Tilley was “hot on her heels.” But the detectives confronted her with evidence that the holster that held the gun had been placed neatly on the bedroom nightstand. In the face of yet another unfortunate lie, Leasure switched gears again. She asserted that Tilley had been physical with her by shoving and “coming after” her and even choking her.
As with Leasure’s other stories, this version of events was also not consistent with the evidence. Deputy DeLuna testified that there were no signs of struggle in Leasure’s home, and Detective Harris noted that Leasure did not “look beaten or battered.” Deputy Harris also observed that Leasure’s asserted fear was suspect because she was holding the revolver and there was a clear discrepancy between the sizes of the couple. Additionally, Leasure was relatively sober and in good health while Tilley was extremely intoxicated and plagued by cirrhosis and other maladies.
The facts of Stinson v. State, 69 So.3d 291 (Fla. 1st DCA 2009), review denied, 70 So.3d 587 (Fla.2011), are analogous to those in this case. In Stinson, the defendant was convicted of second-degree murder with a firearm. Id. at 291. On appeal, she argued that the trial court erred in denying her motion for judgment of acquittal bn the basis that the State failed to rebut her claim that she shot her husband to defend herself during an incident of domestic violence. Id. at 291-92. In rejecting this argument, the court reasoned as follows:
In the instant case, the State presented evidence that appellant (1) lied to both *15 the 911 operator and the police about her involvement in the shooting; (2) hid the murder weapon; and (3) had recently discovered evidence that her husband had been unfaithful. Additionally, one of the police officers testified that appellant did not appear disheveled and did not have any bruises that would indicate that she had recently been the victim of domestic violence.
Id. at 292. Thus, the State’s evidence was sufficient to allow the jury to reject the defendant’s version of events and reasonably infer that she acted out of anger and jealousy because she had discovered that her husband had been unfaithful. Id.
As in Stinson, Leasure lied to the 9-1-1 operator and the police about her involvement in the shooting. She also tampered with the evidence by placing the murder weapon in Tilley’s outstretched hand, and she repeatedly lied to the police about the origin of the weapon and its use in the encounter. Further, she had recently gotten into a heated argument with Tilley based on his drunken antics and his stubborn refusal to accept her rejection. Finally, Leasure’s person did not show any physical signs of struggle, and she did not look “beaten or battered.” Thus, the State’s evidence allowed the jury to reject Leasure’s version of events and reasonably infer that she acted out of anger because she was annoyed with Tilley’s drunken declarations of his love, his failure to leave, and his steadfast desire to continue their relationship. See also Romero v. State, 901 So.2d 260, 265-66 (Fla. 4th DCA 2005) (holding that the State presented sufficient evidence to rebut self-defense in the form of the defendant’s inconsistent versions of events over time and the fact that he left the scene and hid the gun); Cochran v. State, 711 So.2d 1159, 1162 (Fla. 4th DCA 1998) (holding that there were inconsistencies in parts of the defendant’s and his wife’s testimony and the evidence that could allow the jury to reject the defendant’s assertion of self-defense).
Contrary to Leasure’s argument, this court’s decision in Fowler v. State, 921 So.2d 708 (Fla. 2d DCA 2006), does not compel a different result. In Fowler, the defendant was convicted of second-degree murder after he shot and killed a drug dealer. Id. at 709-11. Aside from the defendant, there were no witnesses to the events leading up to the shooting. Id. at 709. The defendant testified that he went to a location near his residence to buy marijuana. Id. at 710. His usual supplier was not around, but a large, well-built man offered to sell him the drugs. As the defendant approached, the man stuck the barrel of a gun though the holes of a ski mask. The man told the defendant that he was going to rob him, put the gun to the defendant’s face, and cocked it.
The defendant reached into his pocket to get money, and the man lowered the gun. Id. A passing car distracted the man, and the defendant grabbed the gun and pointed it at the man. The defendant noticed that the ski mask the man was still holding appeared to have something heavy remaining inside. The man then charged the defendant like he was going to tackle him, and the defendant pulled the trigger. The man crashed into the defendant, and the defendant pulled the trigger again. The gun misfired. The defendant then fled with the gun and the mask and hid them in his home. Id. at 711.
The defendant argued that the trial court erred in denying his motion for judgment of acquittal because the State failed to rebut his testimony that he shot the victim in self-defense. This court agreed, noting that the forensic evidence was consistent with the defendant’s explanation of events. Id. at 713. This court rejected the State’s contention that the defendant’s *16 actions after the shooting rebutted his theory of self-defense. Id. at 712. This court observed that the evidence of the defendant’s flight was not inconsistent with his theory “that he fled because he was panicked, scared, and not using good judgment.” Id. And this court concluded that the State’s failure to offer a theory of the evidence that contradicted the defendant’s was fatal to its case. Id. at 713.
In this case, as in Fowler, the defendant was the only witness to the events leading up to the crime. And in both cases, the defendant panicked after the crime and tampered with the evidence. However, unlike the defendant in Fowler, Leasure intentionally lied to the 9-1-1 operator and Detectives Harris and Garcia about important details of the shooting. Her own story was markedly inconsistent, and she repeatedly changed her statements when confronted with indisputable evidence to the contrary. And while the victim in Fowler posed an immediate threat of serious bodily harm, the victim here, Tilley, was unarmed, inebriated, in poor health, and smaller in stature than Leasure. In fact, it was Leasure, not Tilley, who first retrieved and wielded the firearm. Additionally, as explained previously, the medical evidence did not comport with Leas-ure’s version of the shooting while in Fowler the forensic evidence was consistent with the defendant’s explanation. Finally, there was evidence of another motive for the shooting in this case: Leasure wanted to end the relationship with Tilley, and Tilley refused to accept it.
IV. Motion for Judgment of Acquittal-Malice
Leasure argues that the trial court erred in denying her motion for judgment of acquittal because the State failed to prove that she acted with the requisite intent. Under section 782.04(2), Florida Statutes (2008), second-degree murder requires “a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual.” “[A] depraved mind” requires evidence of “ill will, hatred, spite or an evil intent.” State v. Montgomery, 39 So.3d 252, 255-56 (Fla.2010).
In cases involving circumstantial evidence as to the element of intent, such as this one, the evidence must not only be sufficient to support a finding of guilt; it must also be inconsistent with any other reasonable hypothesis of innocence. State v. Law, 559 So.2d 187, 188 (Fla.1989). The trial court must review the evidence in the light most favorable to the State to determine whether it allows the jury to infer guilt to the exclusion of any other inferences. Id. This does not mean that the State must “ ‘rebut conclusively every possible variation’ of events which could be inferred from the evidence.” Id. at 189 (footnote omitted). Instead, the State must merely “introduce competent evidence which is inconsistent with the defendant’s theory of events.” Id.
“[T]he circumstantial evidence standard does not require the jury to believe the defendant’s version of the facts if the State produces conflicting testimony.” Aguirre-Jarquin v. State, 9 So.3d 593, 605 (Fla.2009). Even when a defendant’s theory of events is not clearly contradicted by direct evidence, a judgment of acquittal is not required if a common sense view of the circumstantial evidence might lead the jury to disbelieve the defendant’s theory. Hampton v. State, 549 So.2d 1059, 1060-61 (Fla. 4th DCA 1989).
The facts of this case are analogous to those in Rasley v. State, 878 So.2d 473 (Fla. 1st DCA 2004). In Rasley, the defendant was charged with second-degree murder for the shooting of her husband. *17 Id. at 475. The marriage had been turbulent and peppered with incidents of spousal abuse by the husband. The defendant said that she had learned her husband was seeing another woman and began packing her suitcases. An argument ensued during which the husband pushed her against a wall. He left but returned and came at the defendant. The defendant pulled out a gun and told the husband to stop his advance. He refused, and she shot him in the head from a distance of two to three and a half feet. The defendant told the police that she thought the safety was on and claimed the shooting was an accident. She said she believed the husband would have beaten her to death if the gun had not gone off.
At trial, the defendant claimed she fired the gun in self-defense. Some of the evidence corroborated the defendant’s version of events, but there were no injuries on the defendant. The defendant argued that the State had failed to present sufficient evidence of intent and that the evidence at most supported a verdict for manslaughter. Id. at 477. The appellate court disagreed, explaining that the circumstantial evidence was equally consistent with an inference that the wife “acted out of anger and jealousy because she had discovered that the husbandMctim was having an extramarital affair.” Id.
In this case as in Rasley, the defendant claimed she shot the victim because she was in fear for her life. In both cases, the defendant presented conflicting statements to the police concerning the manner in which she fired the gun. In both cases, the victim was unarmed and shot while allegedly advancing toward the seemingly uninjured defendant. And in both cases, there was other evidence from which the jury could have inferred a different motive for the shooting and rejected the claim of self-defense.
We reject Leasure’s argument that this was merely a case of an “impulsive overreaction to an attack or injury.” See Bellamy v. State, 977 So.2d 682, 684 (Fla. 2d DCA 2008). In Bellamy, the defendant was convicted of second-degree murder and attempted second-degree murder after he stabbed two people during an “affray” that occurred during a punk rock band performance at a night club. Id. at 683. The stabbings occurred when the crowd involved in the affray, which included the defendant, fell and pushed the defendant to the ground. The defendant did not know either of the victims personally, and there was no evidence of any enmity between them. Id. at 684. This court held that, “while the State’s evidence may have proved an ‘impulsive overreaction to an attack or injury,’ it was insufficient to prove ill will, hatred, spite, or evil intent.” Id.; see also Poole v. State, 30 So.3d 696, 698-99 (Fla. 2d DCA 2010) (holding that defendant’s act of stabbing victim once after the victim lunged at him in closed quarters was not sufficient to support second-degree murder verdict but was “an impulsive overreaction” to the victim’s attack); Williams v. State, 674 So.2d 177, 178 (Fla. 2d DCA 1996) (holding that defendant’s act of stabbing the victim to end his attack was excessive but insufficient to support a second-degree murder conviction).
In the above line of cases, there was no evidence that conflicted with the defendants’ testimony. Thus, the jury was required to believe the defendants’ version of events. And, under those versions of events, the defendants’ use of deadly force could only be explained as an “impulsive overreaction” to an attack. In this case, a common sense view of Leasure’s conflicting stories and the physical evidence that conflicted with her contentions, when considered together with the evidence of mo *18 tive, could lead the jury to disbelieve Leas-ure’s self-defense theory. Accordingly, the trial court did not err in denying her motion for judgment of acquittal.
V. Conclusion
Because the evidence supported the trial court’s finding that Leasure did not establish entitlement to immunity by a preponderance of the evidence, the trial court did not err in denying Leasure’s motion to dismiss. The trial court likewise did not err in denying Leasure’s motion for judgment of acquittal because whether she reasonably believed it was necessary to use deadly force and whether she acted with the requisite ill will, hatred, spite, or an evil intent were appropriate questions for the jury to determine.
Affirmed.
VILLANTI, J.,[2] and DAKAN, STEPHEN L., Associate Senior Judge, Concur.

. Leasure also argues that the trial court applied an erroneous legal standard by stating that she had not proven immunity “beyond a preponderance of the evidence." Based on our review of the entire hearing transcript, we conclude that the trial court misspoke and did not apply an incorrect standard. Regardless, we have applied a de novo review using the proper legal standard and reach the same result.