SACK, MARTIN, Associate Judge.
Appellant, defendant below, appeals her conviction for second degree murder and resulting 20 year sentence on the basis of the sufficiency of the evidence.
At trial, the State presented the following undisputed facts: Sometime after midnight in the 'early morning of May 21, 1973, two neighbors of the defendant, Mr. and Mrs. Richard Herrlinger, were disturbed by loud sounds emanating from appellant’s home across the street. Mrs. Herrlinger heard the first loud noise some fifteen to twenty minutes after 2:00 a. m. No more than a minute later, she and her husband heard another loud noise which both identified as a gunshot. About five minutes later, they both heard an additional shot. At 2:30 a. m., Patrolman Ramer of the Parker Police Department arrived at- the scene and was told by the appellant that she had killed her husband but had not meant to. Investigator Charles Robinson of the Bay County Sheriff’s Office examined the decedent who was lying in bed and had bullet wounds in his upper right chest, his shoulder, and the left side of his face. He also found a .357 single-shot pistol from which five bullets had been fired and one was unfired. Not surprisingly, this pistol was later determined to be the weapon which caused the decedent’s death. Further investigation of the scene of the crime revealed that a bullet had been discharged on the floor of the kitchen, and another had been discharged in the hallway. The State also presented to the jury appellant’s written statement given to Investigator Robinson some two hours after the shooting in which she claimed that she shot and killed her husband only in self-defense of the life of her baby. When the *450 State closed its case, appellant’s attorney-moved for judgment of acquittal or, in the alternative, that the charges be reduced to manslaughter. Both motions were denied.
Appellant never denied' she shot and killed her sixth husband, John, some six days after their marriage. She does contend, as she contended at trial, that the shooting was necessitated in order to protect the life of her 21-month old child, Tracy Marie. In presenting her case, defendant called a friend of hers of 16 years who stated that the appellant was afraid of her husband. Appellant’s mother, Mrs. Myer, testified that appellant called her immediately after the shooting and told her what she had done. When Mrs. Myer arrived at the scene, she stated that the baby did not look like herself as her hair was all messed up, her gown had something poured on it, and she was nervous and fidgety. Finally, appellant testified in her own behalf. She stated that she had been very ill with a reoccurrence of thrombo-plebitis on the day before the shooting and begged her husband to take her to the hospital which he initially refused to do because he was extremely jealous and did not want anyone looking at her. He finally took appellant to the hospital where the doctor gave her a mild medication. Later, that evening, a friend of the decedent’s and a young boy arrived at the house, and the three began to drink beer. When appellant put the baby to bed at 8:30 p. m., the baby cried. The decedent began yelling about the baby crying whereupon his friend and the young boy left. The decedent grabbed the baby and poured cough syrup and a handfull of baby aspirin down her throat. He obtained a belt with which the appellant thought the decedent was going to beat the child. Instead, the decedent tried to tie the baby to the bed. When appellant fought the decedent off, the decedent beat the appellant with the belt. He then went to his bedroom. Although appellant attempted to quiet the baby, she continued to cry whereupon the decedent yelled, “If you don’t shut the baby up, I’m going to shut her up for good.” After more crying, the decedent again yelled, “Shut her up or I’m going to come out there and shut her up for good.” At this point, appellant went to the baby’s room, laid the baby down, and went to the kitchen where she got the gun out of the cupboard. Because she had never fired a gun before, it somehow went off in the kitchen which scared her. She then walked down the hall and, figuring that she had to pull the hammer back to make it shoot, did so, and the gun fired again in the hallway. She testified that by this time, she was hysterical. As she walked into the marital bedroom, she saw her husband in his undershorts on the bed. She fired three shots, dropped the gun, picked it up, and placed it in the kitchen before calling the Bay County Sheriff’s Office and the Parker Police. She told the jury that the only reason that she shot her husband was that she was afraid that he was going to kill her baby. She testified that during the time before they were married but while they were living together, the decedent had beaten the baby with a ruler when the baby would cry over going to bed at night. She further stated that she did not mean to kill her husband as she still loved him.
Appellant now argues that, based on the foregoing evidence, her conviction of second degree murder could not be sustained. More specifically, she asserts that the evidence establishes her theory of justifiable homicide as defined by F.S. § 782.-02 (2) (b). However, the foregoing statute provides that a homicide is justified when committed in the lawful defense of one’s child “. ‘ . . When there shall be a reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished;” (Emphasis added) Amplifying on the words of the statute; the Second District Court of Appeal opined:
“[IS, 16] In order to justify a homicide on the ground of self defense the sitúa *451 tion must be such as to induce a reasonably prudent person to believe that danger was imminent and that there was a real necessity for the taking of life. O’Steen v. State, 1927, 92 Fla. 1062, 111 So. 725. When threats are considered in relation to the defense that the accused killed in self protection, there must be evidence of an overt act which would induce a reasonable belief that the threatened person will lose his life or sustain serious bodily injury unless he immediately takes the life of his adversary. State v. Coles, Fla.1956, 91 So.2d 200. The law disparages the kind of ‘self defense’ which would subject human life-to ‘the mercy of cowardice or capricious impulse of one whose easily awakened fear prompts him, who is armed with a deadly weapon, to strike upon what at best may be called a hostile demonstration on his victim’s part.’ Collins v. State, 1925, 88 Fla. 578, 102 So. 880, 881.” Darty v. State, Fla.App. 2nd 1964, 161 So.2d 864, cert. den., Sup.Ct.Fla.1964, 168 So.2d 147.
Sub judice, there is ample evidence in the record from which the jury could have found that the appellant’s fear of harm to her infant daughter was unreasonable. While the appellant stated that her husband threatened the baby with bodily harm, she testified that the decedent took absolutely no steps to implement his threats after they were made. In fact, from the time that decedent issued his threat to the time that appellant shot him, the decedent remained in the marital bed.
Appellant heavily relies on Harris v. State, Fla.App. 2nd 1958, 104 So.2d 739. That case, however, is factually distinguishable in that the decedent there knocked the defendant’s daughter down on the driveway and followed the daughter into the defendant’s house cursing and abusing her. After being repeatedly ordered to leave, the decedent did go to the steps of the house but then turned to start back into the house, announcing that he was going to cause plenty of trouble, at which point the defendant killed him. The crucial factual distinction between the instant case and the Harris case is that here, the decedent made no move to inflict harm on the infant but was, to the contrary, flat on his back. In the Harris case, the decedent had taken action which could reasonably be interpreted as an attempt to enforce his previously issued threats of violence.
Appellant further asserts that a further circumstance which the jury might well consider in arriving at its decision is the length of time involved. Appellant stated that after the decedent attempted to kill the baby by overdosing it with aspirin and cough syrup, and had issued threats from the bedroom, she laid the baby in her bed and walked to the kitchen to get the gun. Two shots were then fired, (one in the kitchen and one in the hallway) and were about five minutes apart, according to the Herrlingers. Even after these two shots and the length of time, the decedent, according to the appellant herself, remained in the bedroom and made no threatening action toward the baby or herself. The jury might have well concluded that, during the period when appellant and the child were in the livingroom at the front of the house and appellant’s husband was in a rear bedroom, appellant could have taken other action to avoid the threatened injury to the child. She might have simply walked out the front door with the child, as she testified she thought of doing. She might have called the police. She might have called her mother to come for the child. There was ample evidence from which the jury could have found that the means of retreat were open to her.
We, therefore, conclude that there is sufficient evidence in the record from which the jury could have found the appellant guilty of second degree murder, thereby rejecting appellant’s claim of justifiable homicide.
Affirmed.
*452 SMITH, J., concurs.
BOYER, C. J., dissents.