JARVIS BALLARD

VERSUS

STATE OF LOUISIANA

\* \* \* \* \* \* \*

NO. 2024-CA-0606

COURT OF APPEAL

FOURTH CIRCUIT

STATE OF LOUISIANA

APPEAL FROM
ST. BERNARD 34TH JUDICIAL DISTRICT COURT
NO. 23-1005, DIVISION "C"
Honorable Kim C. Jones, Judge Presiding
\* \* \* \* \* \*
**Judge Karen K. Herman**
\* \* \* \* \* \*
(Court composed of Chief Judge Roland L. Belsome, Judge Rosemary Ledet,
Judge Karen K. Herman)

Taylor D. Waxley
Michael A. Morton
FORMAN WATKINS & KRUTZ LLP
201 St. Charles Avenue, Suite 2100
New Orleans, LA 70170

Teeanna A. Brisco, *Pro Hac Vice*
Christopher D. Wilkinson, *Pro Hac Vice*
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, DC 20005

  COUNSEL FOR PLAINTIFF/APPELLEE

Elizabeth Baker Murrill
LOUISIANA ATTORNEY GENERAL
J. Bryant Clark, Jr.
J. Taylor Gray
Stephanie May Bruno
ASSISTANT LOUISIANA ATTORNEY GENERAL
Louisiana Department of Justice
 P.O. Box 94005
Baton Rouge, LA 70804

  COUNSEL FOR DEFENDANT/APPELLEE

**AFFIRMED
MARCH 14, 2025**

This is a wrongful conviction compensation case pursuant to La. R.S. 15:572.8. Appellant, the State, through the Louisiana Attorney General ("the State"), appeals the trial court's July 22, 2024 decision, which granted the petition for compensation for wrongful conviction and imprisonment filed by Appellee, Jarvis Ballard ("Ballard"). For the following reasons, we affirm the trial court's judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

This Court in *State v. Ballard*, 2020-0617, pp. 1-2 (La. App. 4 Cir. 7/21/21), 325 So.3d 450, 455-56, summarized the facts leading to Ballard's conviction as follows:

> In the early morning hours of January 10, 1998, N.D. [the victim] called 911 to report a sexual assault and robbery in her home. The police arrived shortly thereafter and the sixty-year-old victim related that she opened her door at 2 a.m. on the assumption that the knock on her door was her son arriving to pick up his young son. However, when she opened the door "two black males, one dressed in a red pullover shirt with a hood, the other wearing a dark colored parka style jacket with a hood" shoved their way into the house, raped her (one vaginally, the other both anally and vaginally with his fingers), threatened her, and then left with several electronic items and a ring from her finger. The victim's grandson (who witnessed the assault) told the police he saw only two men.[1] Likewise, the victim's

---
[1] At the time of the incident the grandson was approximately three years old.

1

neighbors reported seeing only two men carrying items between the victim's house and a car parked in front of the house.

The victim underwent a sexual assault examination at the hospital to obtain evidence for a rape kit, *i.e.,* DNA analysis. She then gave a [] statement at the police station, reiterating that two perpetrators were involved and that one of them placed his fingers in her vagina. When asked if she recalled any other participants in her home, she answered "No."

Ballard, along with two others, Sidney Williams ("Williams") and Ulysses Pierre ("Pierre"), were indicted for aggravated rape.[2]

Ballard was convicted of aggravated rape on July 21, 1999.[3] Ballard was sentenced to life without the possibility of parole. The conviction and sentence were affirmed by this Court on July 25, 2001, and rehearing was denied on September 6, 2001. *See State v. Pierre*, 1999-3156 (La. App. 4 Cir. 7/25/01), 792 So.2d 899. The Louisiana Supreme Court thereafter denied supervisory review on September 13, 2002. *State v. Ballard*, 2001-2409 (La. 9/13/02), 824 So.2d 1189.

On March 17, 2017, Ballard applied for post-conviction relief and filed two supplemental applications in April and November 2018.[4] In the applications, Ballard raised several claims, including *Brady* violations and ineffective assistance of counsel. The trial court denied Ballard's application.

---

[2] *See Ballard,* 2020-0617, p. 2, 325 So.3d at 455-56 (noting that Ballard was indicted "for sexual assault on the victim, despite the lack of any DNA evidence linking him to the crime").

[3] Williams' case was severed from his co-defendants and he was found guilty as charged. Ballard and Pierre were tried together and found guilty as charged. *See Ballard*, 2020-0617, p. 2, n. 1, 325 So.3d at 455.

[4] The record reflects that Defendant also filed a *pro se* post-conviction application in 2001 and in 2013, both of which were denied. *See Ballard*, 2020-0617, p. 3, 325 So.3d at 456. The Innocence Project New Orleans accepted Ballard as a client and filed the more recent application on his behalf. *Id*.

This Court, on supervisory review of the trial court's judgment, noted that Ballard's application was "supported by substantial evidence and documentation, including supplemental police reports and other evidence known to the State but withheld from the relator [Ballard], new accounts from witnesses, DNA results, expert reports, and numerous related affidavits." *Ballard*, 2020-0617, p. 3, 325 So.3d at 456. This Court then affirmed the trial court in part, reversed in part, vacated in part, and remanded to the trial court for an evidentiary hearing.[5]

Subsequently, on August 2, 2021, the trial court executed a joint motion to vacate the conviction and dismiss the indictment of Defendant "on the basis of ineffective assistance of counsel." The motion also noted "evidence at the scene of the crime was found matching that of Ulysses Pierre, Mr. Ballard's co-defendant, but not Mr. Ballard himself." Ballard's conviction was vacated and he was subsequently released from custody.

On August 3, 2021, a press release was issued by the St. Bernard Parish District Attorney's Office, which stated in part:

> In the State of Louisiana v. Jarvis Ballard, new evidence came to light in the proceedings for Post-Conviction relief. DNA evidence, witnesses recanting their prior statements and polygraph testing all support the "actual innocence" claims of Jarvis Ballard.

On August 1, 2023, Ballard filed the instant petition for compensation for wrongful conviction and imprisonment pursuant to La. R.S.15:572.8. A contradictory hearing was held on April 22, 2024.

---

[5] This Court agreed that some of Ballard's claims were procedurally barred but reversed the trial court with respect to Ballard's claims based on *Brady*, post-conviction DNA testing, newly discovered evidence (post-trial affidavits of co-defendant recanting and of co-defendant's mother), and ineffective assistance of counsel. *See Ballard*, 2020-0617, p. 33, 325 So.3d at 474.

Hearing on the Petition

Defendant called several witnesses to testify at the hearing, including: Williams; Pierre; Quandreka Ballard ("Quandreka"), Ballard's sister; Dr. Deryn Strange, a psychologist who provided information on eyewitness identification; Dr. Gregory DeClue, a forensic psychologist, and Anne Montgomery, an expert in DNA analysis who conducted the 1998 DNA analysis report. The State called one witness: Christina Nash, a DNA analysis expert who authored the 2018 DNA analysis report.

*Sidney Williams*

Williams testified only Pierre and Quandreka were with him on the night of the incident. He stated that Ballard was not at the victim's residence "at any point" and was not involved in the planning of the incident. Williams testified: "[Ballard] wasn't there. He had no role in [the events]." Williams noted that in his initial statement to the police, he also stated that Ballard "was not there."

On cross-examination, Williams denied being present for Ballard's trial. However, the State presented and offered into evidence the trial transcript which provided that William's attorney stated in open court: "And I should proffer to the Court that I think his [William's] testimony would be unfavorable to Mr. Ballard, should he be called to testify to any of the events." Williams' attorney further represented that although the State did not offer a deal, Williams "indicated to me [the attorney] that he [Williams] has recanted the part of his statement about whether or not Jarvis Ballard was there." Williams, however, testified that he did not recall these statements being made and denied being present at Ballard's trial.

On redirect, Williams stated he never told his attorney that Ballard was at the scene of the crime.

*Ulysses Pierre*

Pierre testified Williams and Quandreka were with him the night of the incident. He stated that Ballard had no role in the events that transpired, stating: "[Ballard] wasn't there at all." Pierre also said that Ballard was not involved in the planning and was not in the car with them.

Pierre also testified that initially he told the police Ballard was not present at the crime scene. He also said "nobody" else was with him. However, Pierre testified during the police interrogation, he was handcuffed to a chair, "maced," and hit across his face with a phonebook.[6] Pierre also stated the police had threatened him. As result, Pierre eventually implicated Ballard. Pierre explained: "by me saying Jarvis [Ballard] I'm thinking he—they don't have nothing on him, they not going to be able to hold him…" He stated that he did not want to name Williams because he was "scared to death of" him at the time.

Pierre also stated that he saw Ballard at the police station. He said he observed the police take Ballard "around the corner" and when he saw him again Ballard's "face was dripping wet."

Pierre testified that he executed an affidavit in November 2017, which was admitted into evidence. He stated that in the affidavit he stated that Ballard had no part in the crime.

In his affidavit, Pierre stated that Williams, known by the nickname "Bird," picked him up from the corner of his neighborhood. He stated that Quandreka was also in the car. Upon entering the car, Pierre said Williams told him about wanting to rob a home and Pierre agreed to help. He stated they pulled up in front of a

---

[6] In the suppression hearing transcript, which was offered into evidence by the State, Pierre also maintained he was threatened, "pepper sprayed," and "smacked" with a book during the police interrogation.

house and knocked on the door. Pierre said an "older white lady" answered and he and Bird pushed in the home. Quandreka stayed in the car. Pierre admitted to raping the victim and tying her up. Pierre and Williams grabbed items from her home and placed them into the car trunk. He stated they put the stolen items in a shed of some woman named Tracey. Pierre attested that he first told the police that he "committed the crime" and that it was "him alone." However, Pierre said the police threatened and hit him and "so [he] lied and told the police Jarvis Ballard was there even though he wasn't." Pierre also attested he was confused when he learned Ballard had signed a statement indicating that he had committed the crime.

On cross-examination, Pierre stated that he told the police Ballard was with him after "about the tenth time" he was struck with a phonebook. He agreed that he lied to the police when he said that Ballard was present the night of the crime.

Pierre conceded that he never reported that he was coerced into making the statement implicating Ballard. He testified that he did advise his "indigent defender" that Ballard did not participate in the crime. Pierre testified that a plea deal was offered to Ballard, William, and himself and was contingent upon all three of them taking the deal. He stated that Ballard refused to take the deal. Pierre admitted that he did not make a sworn statement between 1998 (the time of his police statement) and 2017 (the date of the affidavit) suggesting that Ballard did not commit the crime.[7]

---

[7] During cross-examination, Pierre was also questioned about whether he testified at the suppression hearing. He denied testifying, but said he did answer some questions but not "under oath." However, the hearing transcript shows he did in fact testify.

*Quandreka Ballard*

Quandreka testified that she had previously dated Williams and that Pierre is her cousin. She testified the night of January 9, 1998, Williams came to her grandmother's home at about 10 or 11 p.m. and knocked on her bedroom window.

Williams pressured Quandreka to come outside. They then walked to Farrell Anderson's house, Williams's cousin, to borrow his car. After declining Williams's advances, Quandreka asked him to take her back to her grandmothers. During the car ride, Quandreka stated Williams was on the phone with a man named "Bucky" who was telling him about a woman he worked for "who was out of town and had a safe." Quandreka testified that they saw Pierre standing outside an apartment on Caluda Lane and Williams asked Pierre to get in the car. They continued towards Quandreka's grandmother's home.

Quandreka stated when they got to her grandmother's, Williams said: "I changed my mind. I need you." They then drove to the victim's home. Quandreka stated that she stayed in the car and that Pierre and Williams entered the house. After a while, Pierre exited the home and admitted he raped the victim. Williams returned to the car and they dropped stolen items at a friend's shed.

Quandreka testified that eventually she was dropped off at her grandmother's house and Williams forced her to take a ring. When questioned about whether she had any conversations with her brother [Ballard] when she returned to her grandmother's home Quandreka stated "No. He was asleep." Quandreka testified that there was no point that Ballard was with them the night of the incident. She stated Ballard had gone to a party with friends and was asleep by the time she had returned home.

Quandreka stated that when she learned Ballard was arrested she told the police "He was not there…. Ya'll got the wrong person." When questioned about the role Ballard played in the crime, Quandreka stated: "He didn't have no knowledge, he did not know anything about it, and that's just all I can say. There is nothing that he knew, no knowledge, no nothing."

On cross-examination, Quandreka indicated that she did not testify at Ballard's trial "under the advice of counsel." She admitted that she was charged with being an accessory after the fact. Quandreka indicated that she was re-arrested after she had finished her probation because Ballard would not cooperate. She said those charges were dismissed based on a motion for double jeopardy. Quandreka stated at the time of Ballard's trial, no charges were pending against her. Quandreka stated that she never advised Ballard's attorney that Ballard was not present at the scene. She also testified that her testimony at the instant hearing was the first time she revealed that Ballard was not involved in the crime under oath.

*Dr. Deryn Strange*

Dr. Deryn Strange, an expert in the field of academic psychology, provided testimony regarding "general psychological principles as to eye witness identification." Dr. Strange stated that memory is made up of a three-step process: encoding, storage, and retrieval. She said there are things that can go wrong at each of those stages which can distort memory.

Dr. Strange noted that stress, trauma, an "obscured view" (such as a hat or hood), suggestive identification procedures, and the passage of time, can impact memory and affect the accuracy of an identification.

Dr. Strange also provided testimony regarding the photographic line-up shown to the victim, which was offered into evidence. She stated that there was no

"double-blind administration," the quality of the photos are blurry, and "the suspect stood out." The photo-array was introduced into evidence.

Dr. Strange testified that she reviewed the victim's initial statement, which was offered into evidence. She noted that the victim stated that there were two perpetrators. Dr. Strange stated that she believed the statement was taken within nine to twelve hours from the event and the photographic line-up was presented to her several days after incident.

In the victim's statement, she stated that at approximately 2:00 a.m. someone knocked on her door. She stated that she was watching her grandson at the time, so she thought it was her son and opened the door. Upon opening the door, she observed one black man and told him that he got the wrong house and attempted to close the door. The man pushed his way in, followed by another black man. The victim backed down the hallway towards the bedroom where her grandson was sleeping. The men followed her into the bedroom. One started riffling through her drawers and closest. The other was holding her around her neck. The man "going through her stuff" kept asking about money. Eventually that man directed the man "who had his arm around [her] neck" to tie-up the victim, put her facedown on the bed, and "just f*ck her." The second man then raped her. He initially attempted to rape her from behind but then turned her over and vaginally penetrated her. The other man got a pillow and held it over her face, "as if he was going to smother me" and "kept asking [her] where [her] money was." He then anally penetrated the victim several times. The victim was tied-up again. The man "that had the pillow" continued to rummage through belongings, asked for something of value, and pulled off the victim's ring. Eventually, after threating to kill the victim and putting a pillowcase over her head, both of the men left.

10

Dr. Strange's report was also admitted into evidence. The report stated that there was a "significant number of factors that are likely to have affected the victim's identification of Mr. Ballard, which included: at encoding, the crime was traumatic and there were multiple perpetrators... suggestive procedures that were employed... [the] lack of any procedural safeguards, and the suggestive feedback [the victim] received."

On cross-examination, Dr. Strange admitted that she did not speak to the law enforcement that conducted the photographic line-up or the officers that took the victim's first and second statement. She conceded that she is not providing an opinion about the victim's misidentification but just testimony about factors that may have influenced her memory and identification.

On redirect, Dr. Strange stated that she also reviewed the victim's second report, which was admitted into evidence.

The victim's second statement contained the following question from the police: "We have arrested three subjects in connection with the rape and burglary. You were able to identify two of the subjects. Do you feel like there could have been three assailants inside your residence at the time of the assault?" The victim responded "Yes, it's entirely possible. I was face down on the bed during most of the sexual assault and of them keep leaving the room and coming back into the room."

Dr. Strange also noted that the victim admitted at trial[8] that the photographic line-up, which included a photo of Ballard, was "far less distinct, dark, and unrecognizable than in the first two sets."

---

[8] The trial testimony of the victim was stipulated to by both parties at the beginning of trial.

*Dr. Gregory DeClue*

Dr. Gregory DeClue, an expert in the field of forensic psychology, testified regarding factors that could cause an innocent person to make false confession, which included the "vulnerability of the suspect, the police interrogation tactics, [and] the timing and circumstances of the evaluation itself."

Dr. DeClue stated that he reviewed the January 10, 1998 statement Ballard gave to the police. He stated some important safeguards were not employed in taking Ballard's statement to protect against obtaining a false confession. For instance, Dr. DeClue noted it did not appear that the police held back details that would have been only known to the true perpetrator. He also noted that the police did not tape the recording of Ballard.

Ballard's statement was offered into evidence. In the statement, Ballard confesses to robbing and raping the victim with "Bird" (Williams) and "Noon" (Pierre).

Dr. DeClue also testified that he reviewed Ballard's school records and juvenile detention records, which revealed that Ballard had a learning disability and a history of impulsivity. The school records were introduced into evidence.

Dr. DeClue opined that Ballard was a vulnerable suspect due to his learning disabilities and would be more at risk at misunderstanding the situation. He also noted he had behavioral problems at school and eventually was diagnosed with oppositional defiant disorder, which is when there is a pattern of responding to authority figures "by resisting the authority or — and maybe doing the opposite of what people expected."

Dr. DeClue noted the US Department of Justice 1996/1997 investigation of four juvenile facilities in Louisiana and that they had uncovered systematic life-threatening staff abuse and juvenile-on-juvenile violence.

Dr. DeClue reviewed Ballard's medical records, which were introduced into evidence that indicated in October of 1998 Ballard had a right inguinal hernia repair. He also noted that in his review of Ballard's trial testimony, Ballard testified that he was kicked in the testicles/groin by the police. Ballard also testified that he was pepper sprayed during the police interrogation. The excerpt of Ballard's trial testimony was admitted into evidence.

Dr. DeClue summarized his findings on Ballard's confession as follows:

> [I]t's my opinion that Mr. Ballard was questioned by the police at a time he was a vulnerable suspect, that his vulnerabilities related to his learning disability, impulsivity, and prior experiences both in school and in detention facilities that made him more prone to not understanding the whole situation, especially if the police would have been either deliberately or inadvertently using misinformation. Just so that part's clear, if the police deliberately misled a suspect, as police will do in American interrogation, or if they had a misunderstanding about the facts and sincerely believed that Mr. Ballard was there at the time, even though he wasn't, then Mr. Ballard, due to these vulnerabilities, would have had a decreased ability to psychologically maintain concentration and an appropriate demeanor and put up with the difficult situation. All of that is even if he had not been in any way physically mistreated by the police and all of that would be even if when the police say they wrote down everything that he said and that they wrote down all the questions that he was asked and nothing else was asked or spoken during then, even if that part was true, then Mr. Ballard was vulnerable. Now, in addition to all of that, the police clearly, in this case, did not use proper safeguards to protect against the risk of getting a false confession and to protest — protect against the risk of getting a wrongful conviction if they were to get a false confession from — from a suspect.

Dr. DeClue testified that about twenty-five percent of people who are exonerated by DNA evidence had given a false confession.

Dr. DeClue stated that he had reviewed the initial police report, which was admitted into evidence. The police report provided that the neighbors and the victim had reported that there were only two perpetrators.

Dr. DeClue testified that he reviewed the statement of Yolanda Caesar ("Yolanda"), and Louis Caesar ("Louis") who lived next door to the victim. Both statements were entered into evidence.

In her statement, Yolanda testified that on January 10, 1998, a little before 2:00 a.m., a man who introduced himself as "Lil' Noon" (Pierre) knocked on her door. He asked to speak with her son, Louis Caesar. Yolanda declined and told him to come back tomorrow. She noticed a car running outside her home. Yolanda stated that she later saw that the car had moved in front of the victim's home. She stated that she saw Pierre carrying out something from the victim's house. Yolanda stated that she woke up her son and he said to call the police because the victim was being robbed. She stated that she observed Pierre go back and forth from the car to the house several times. Yolanda said eventually Pierre got in the car and she observed another man exit the house. She also stated that she observed a young girl in the car. After the second man entered the car, they drove away.

In his statement, Louis said at approximately 2:20 a.m., the night of the incident, his mother woke him up and said a man named Noon wanted to speak with him. Louis laid back down to sleep. A few minutes later, his mother returned and said the man who had knocked on the door was robbing the house next door. Louis stated he looked out the window and saw Lil' Noon running back and forth with stolen property from the house to the car. He advised his mother that Lil' Noon was Pierre. Louis then observed a second man exit the victim's house and

14

told his mom to call the police. Louis stated the car was a dark, two-tone Chevy Caprice. He could not identify the second man.

On cross-examination, Dr. DeClue admitted he does not know the name of the person who diagnosed Ballard with learning disability or oppositional defiant disorder. He admitted that he did not specifically know of any abuses Ballard suffered in juvenile detention but that that was part of a system and community where systematic abuses occurred. Dr. DeClue also noted that the school records show there was a notation regarding his strength in math skills and cognitive abilities.

*Anne Montgomery*

Anne Montgomery, DNA analysis expert, testified that she conducted the DNA analysis "of blood, semen, epithelial cell samples, and physical items from the 1998 crime" at issue. The DNA report, dated October 15, 1998, was admitted into evidence.

Montgomery stated the following items were tested: three cuttings from the bed sheets, one cutting from the bed comforter, a cutting from a pair of white boxer shorts, a cutting from a pair of sweatpants, a cutting from two separate sweatshirts, and a cutting of "panty tights." She testified these items were tested against samples obtained from Williams, Pierre, and Ballard.

With regard to the 1998 report, Montgomery stated neither Williams nor Pierre were excluded as a contributor to the bedding. She testified that Ballard's DNA, however, was not detected on any of the items tested, aside from his own sweatpants.

Montgomery also reviewed the 2018 DNA report and stated that Ballard's genetic profile is not contained on the samples tested therein. She stated that the

1998 and 2018 report support each other. The 2018 DNA report was later admitted into evidence.

In response to defense counsel's question whether she could "confidently state that Mr. Ballard's DNA was excluded from every test from both reports," Montgomery stated "[w]ith the exception of the sweatpants that are attributed to him, [Ballard] was not present in any of the evidence that was identified and profiled in the '98 report or the 2018 report."

On cross-examination, Montgomery admitted that in her 1998 report, there were samples containing partial profiles of an "unknown donor." For example, with regard to one of the cuttings of the bedsheets, it contained genetic markers of the victim and another unknown donor. When questioned regarding whether Ballard could be excluded as the unknown donor, Montgomery stated: "if I felt that he [Ballard] was implicated, I would have implicated him in that report in '98…. I would have said he cannot be excluded."

On redirect, Montgomery reiterated that Ballard's DNA was not identified in any the testable material from 1998 or the 2018 report, aside from his own sweatpants. She further stated she did not have "any hesitancy in stating that Jarvis Ballard's DNA was not present" in her report.

*Christina Nash*

Christina Nash, an expert in forensic DNA analysis, testified she authored the March 2018 DNA analysis report related to Ballard. She stated the "items where we had comparable DNA, Jarvis Ballard was excluded. Samples that we weren't able to compare him to [were] deemed unsuitable for conclusions." For instance, she stated that one of the samples of victim's underwear, the DNA profile was consistent with "a mixture of at least two individuals, including a major male

16

contributor." Nash stated that Ballard was excluded as a possible major contributor, as to the "remaining alleles, due to limited data, no conclusion could be made." Nash stated because no conclusion can be made as to the "minor alleles" "no one can be included or excluded."

On cross-examination, Nash testified that for the 2018 testing, Ballard's genetic profile was the only profile submitted for comparison. She stated Ballard was excluded as to all "comparable materials."

At the conclusion of the hearing, the trial court took the matter under advisement.[9]

On July 22, 2024, the trial court executed a judgment and reasons for judgment, granting Ballard's compensation petition, stating in part "Jarvis Ballard, has proven by CLEAR AND CONVINCING scientific or non-scientific evidence that he is FACTUALLY INNOCENT of the crime for which he was convicted, i.e., that he did not commit the crime for which he was convicted or any crime based on the same set of facts used in that conviction."

Thereafter, the State moved for a rehearing and reconsideration, as well as alternatively moving for an appeal and a stay of proceedings. The trial court denied the request for rehearing/reconsideration and granted the appeal and stay. The State's timely appeal followed.

---

[9] In addition, to the testimony and evidence discussed above, Ballard also offered the following exhibits into evidence: the Grand Jury Indictment; excerpt of trial transcript examination of Julie Golden, who performed the initial 1998 DNA test with Montgomery; Williams's statement; and Quandreka's statement. The State offered the suppression hearing transcript and three Westlaw print-outs of cases, which the State used to question Ballard's expert witnesses.

**APPLICABLE LAW**

La. R.S. 15:572.8, "[t]he Wrongful Conviction Compensation Statute[,] 'is *sui generis*, and governs a unique situation' such that it is 'the only relevant authority governing' petitions for compensation for wrongful conviction and imprisonment.'" *Jones v. State,* 2022-01455, p. 5 (La. 5/5/23), 362 So.3d 341, 344 (quoting *Burge v. State*, 2010-2229, p. 6 (La. 2/11/11), 54 So.3d 1110, 1113).

La. R.S. 15:572.8 provides, in pertinent part:

A. A petitioner is entitled to compensation in accordance with this Section if he has served in whole or in part a sentence of imprisonment under the laws of this state for a crime for which he was convicted and:

(1) The conviction of the petitioner has been reversed or vacated; and

(2) The petitioner has proven by clear and convincing scientific or non-scientific evidence that he is factually innocent of the crime for which he was convicted.

B. For the purposes of this Section, "factual innocence" means that the petitioner did not commit the crime for which he was convicted and incarcerated nor did he commit any crime based upon the same set of facts used in his original conviction.

\* \* \*

D. … The court may consider any relevant evidence regardless of whether it was admissible in, or excluded from, the criminal trial in which the petitioner was convicted.

Thus, La. R.S. 15:572.8, "requires proof of factual innocence by clear and convincing evidence." *Jones*, 2022-01455, p. 5, 362 So.3d at 345 (citing La. R.S. 15:572.8(A)(2)). "To meet the clear and convincing evidence standard, the petitioner must 'prove the existence of a contested fact is highly probable, or much more probable than its non-existence.'" *Id.*, pp. 5-6, 362 So.3d at 345 (quoting *Talbot v. Talbot*, 2003-0814, pp. 9-10 (La. 12/12/03), 864 So.2d 590, 598).

In reviewing an application for compensation for wrongful conviction and imprisonment pursuant to La. R.S. 15:572.8, an appellate court "must afford great weight to the findings of the trier of fact and apply the manifest error standard." *State v. Ruano*, 2019-0709, p. 4 (La. App. 4 Cir. 3/4/19), 294 So.3d 44, 46 (citing *State v. Ford*, 50,525, p. 5 (La. App. 2 Cir. 5/18/16), 193 So.3d 1242, 1247). "Further, '[t]he issue is not whether the trial court's findings are right or wrong, but whether they are reasonable on the record as a whole.'" *Id.*[10]

**DISCUSSION**

The State asserts four assignments of error: (1) the trial court erred as a matter of law in applying an "incorrect evidentiary burden;" (2) the trial court committed "manifest error of material facts;" (3) the trial court erred as a matter of law in "considering items not contained in the record[;]" and (4) the trial court erred in finding that Ballard met his burden of factual innocence under La. R.S. 15:578.9.

---

[10] The Louisiana Supreme Court in *Jones* also held that in a wrongful conviction compensation case, the petitioner need not introduce "new, material, noncumulative, and conclusive evidence" to establish he is factually innocent. *Jones v. State,* 2022-01455 (La. 5/5/23), 362 So.3d 341. The *Jones* Court stated in part:

> The State argues that existing jurisprudence interpreting La. R.S. 15:572.8 requires a heightened evidentiary burden. *See Burrell v. State*, 50,157, pp. 11-12 (La. App. 2d Cir. 1/13/16), 184 So.3d 246, 252-53; *Jones v. State*, 19-1570, p. 4 (La. App. 1st Cir. 9/18/20), 313 So.3d 997, 1000.[]Specifically, the State asserts that a petitioner must present new, material, noncumulative, and conclusive evidence [based on the new article, La. C.Cr.P. art. 926.2 on post-conviction claim of factual innocence] that meets an extraordinarily high standard and undermines the prosecution's entire case. *See Burrell*, *supra* (citing *State v. Conway*, 01-2808 (La. 4/12/02), 816 So.2d 290 and *State v. Pierre*, 13-0873 (La. 10/15/13), 125 So.3d 403). Mr. Jones counters that the plain language of La. R.S. 15:572.8 contains no such heightened evidentiary burden and that the court of appeal properly conducted a *de novo* review of the record. We agree.

*Jones*, 2022-01455, p. 4, 362 So.3d at 344.

Incorrect Evidentiary Burden / Manifest Error of Fact

With regard to alleged erroneous interpretation of the evidentiary burden, the State notes that in the trial court's reasons for judgment, the trial court stated that Ballard "began the hearing… actually innocent." The reasons for judgment provide in part:

> Mistakes happen. Mistakes happen by lawyers. Mistakes happen by witnesses. Mistakes happen by Courts. Mistakes happen by other legal actors within our system of justice. The injustice would be for a system which did not and/or does not recognize that people, no matter how passionate—are imperfect and make mistakes. Legal errors occurred in this case which deprived Jarvis Ballard in excess of twenty-three years of freedom and opportunity. *He began the hearing before this Court on April 22, 2024 actually innocent. He has now come before this Court and established his claim of factual innocence.* Jarvis Ballard has proven by clear and convincing evidence that he did not commit the crime for which he was wrongfully convicted nor did he commit any other crime based on those same set of facts.

(Emphasis supplied).

The State argues that the trial court's above statement regarding actual innocence shows that the trial court applied a legal presumption of actual innocence prior to the hearing. *See State v. Alexander*, 22-12, p. 14 (La. App. 5 Cir. 6/21/23), 367 So.3d 867, 879 (noting that "in a civil petition for compensation for wrongful conviction and imprisonment, a petitioner does not have the benefit of a presumption of innocence, but rather is tasked with producing evidence to prove his factual innocence"). The State contends because the trial court applied the incorrect burden, this Court need not give weight to the trial court's findings and should apply a *de novo* review.

Prior to addressing the State's arguments, we acknowledge that a trial court's "written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment," an appellate court,

20

however, "may review the trial court's reasons for judgment to 'gain insight' into the trial court's judgment." *See TKTMJ, Inc. v. Sewerage and Water Board of New Orleans,* 2020-0154, p. 3, n. 4 (La. App. 4 Cir. 12/16/20) 366 So.3d 276, 282.

Upon review of the entire reasons for judgment and the record, it is apparent to this Court that the trial court understood and applied the correct evidentiary burden.

At the outset of its reasons for judgment, the trial court recognized that under La. R.S. 15:572.8, Ballard had the "burden of proving it is highly probable or much more probable than not that he did not commit the crime for which he was convicted." Citing the statute and relevant case law, the trial court further discussed the legal requirements to be entitled to compensation for wrongful conviction and stated that the petitioner must prove "by clear and convincing evidence" that he is "factually innocent of the crime for which he was convicted." Additionally, as will be discussed later herein, the trial court heard and considered numerous witnesses and exhibits prior to determining that Ballard met his burden of establishing his factual innocence and entitlement to compensation. We find that considering the litany of evidence and law discussed in the reasons for judgment, the trial court understood and applied the correct clear and convincing burden of proof to Ballard's claims for compensation.[11]

The trial court discussed and analyzed the evidence submitted by the parties at length prior to determining Ballard was entitled to compensation. There is no

---

[11] Moreover, in reciting the procedural history of the case, the trial court noted when Ballard's conviction was vacated, the St. Bernard Parish District Attorney's Office had issued a press release that stated that the evidence on Ballard's application for post-conviction relief "supported the actual innocence claims" asserted by Ballard. Further, one ground of relief on post-conviction is when a convicted petitioner can show "he is factually innocent of the offense for which he was convicted. *See* La. C.Cr.P. art. 926.2. In discussing Ballard's post-conviction proceeding and the subsequent press release, it is arguable that when the trial court stated Ballard began the hearing "actually innocent" it was referring to the prior procedural posture of the case.

indication that the trial court presumed Ballard's innocence in reaching its conclusion. This assignment of error lacks merit.[12]

The State also contends the trial court, in its reasons for judgment, improperly characterized this Court's decision in *Ballard*, 2020-0617, 325 So.3d 450, as "flatly reject[ing]" the State's arguments whereas it reversed on procedural objections and did not render on the merits of any claim. The reasons for judgment provide, in pertinent part:

> The Court begins by reporting that the Court of Appeal for the Fourth Circuit did an exhaustive examination of the record in this case before the District Attorney and Mr. Ballard's attorneys (Innocence Project New Orleans, IPNO) agreed to the Joint Stipulation vacating and dismissing all charges against Mr. Ballard … however, the State of Louisiana (through the Office of the Attorney General) continues to raise essentially two arguments in their opposition to petitioner's Petition for Compensation: namely, that, "the strongest piece of evidence tying Petitioner to the crime was victim N.D.'s identification of him as the perpetrator, "and that "the jury saw Petitioner's purported evidence of a coerced confession... and was not moved by this."

> The Court will address the identification by N.D. (N.D. is the referenced victim) infra in these Reasons but pauses to note that the Fourth Circuit was emphatic when it stated, "the issue of [Mr. Ballard's] co-defendant's recantation of the portion of his statement inculpating [Mr. Ballard] in the crime was made subsequent to his conviction and not addressed at trial." *State v. Ballard,* 325 So.2d 450, 471 (La. App. 4 Cir. 07/21/21). The jury may or may not have seen the "purported evidence" of Petitioner's coerced confession, however, the Court in *Ballard* noted that the statement by Mr. Anderson (Ferrell Anderson [which buttressed petitioner's alibi] and which was included in the supplemental police report which underlie[d] [Mr. Ballard's] *Brady* claim) was not provided to Petitioner prior to trial—and is in direct contradiction to the State's current statement that the jury saw

---

[12] The State also suggests that *de novo* review is warranted because the trial court committed manifest error of fact. The State notes that the joint motion for vacate was based on ineffective assistance of counsel and that this "does not indicate any determination of innocence was made as to [Ballard]." This argument appears to be related to the trial court's alleged presumption of innocence of Ballard. We agree that a finding of ineffective assistance of counsel does not equate to finding of factual innocence. However, as noted above, we find that the trial court understood the appropriate evidentiary standard and are not persuaded by the State's argument.

all of the evidence as it related to petitioner's coerced confession. *Ballard*, 325 So.2d 450 at 471 (Emphasis added). *The State continues to raise arguments that were flatly rejected by the Fourth Circuit.* Mr. Ballard's confession and later recantation asserting his truthfulness that he was indeed not involved in the rape of N.D or any other crime based on those same set of circumstances are strongly supported by the complete record in this case. The State's continued contention relative to such an argument is unsupportable and lacks merit.

(footnotes omitted),(emphasis added).

The State is correct in that *Ballard* "reverse[d] the district court judgment to the extent that it dismisse[d] the relator's [Ballard's] claims as procedurally barred and vacate[d] the district court judgment to the extent that it dismisse[d] the relator's [Ballard's] claims on the merits." *Ballard,* 2020-0617, p. 33, 325 So.3d 450, 474. However, the *Ballard* Court did cast doubt on several of the State's arguments in opposition to Ballard's claims for post-conviction relief and addressed the lower court's conclusions "with particular specificity" "to avoid confusion upon remand." *Id*., p. 19, 325 So.3d at 466.

For example, on post-conviction, Ballard claimed *Brady* violations because his trial counsel "only received the initial police report and remained unaware of statements and other evidence in the State's file highly indicative of the fact there were only two perpetrators (Williams and Pierre) involved in this crime." *Ballard,* 2020-0617, p. 18, 325 So.3d at 466. The *Ballard* Court found that "[w]ith regard to the State's assertion that [Ballard's trial counsel] 'absolutely' had access to the supplemental police report … the State presents no evidence to support its hyperbolic certainty." *Id*. at p. 20-21, 325 So.3d at 467.

Nevertheless, we find that the trial court's analysis of *Ballard* does not amount to manifest error of material fact. Further, this Court reviews judgments

and not reasons for judgments, and as discussed herein even if the trial court had misstated aspects of the procedural history, the record supports an award for compensation for wrongful conviction.

Evidence Outside the Record

As its third assignment of error, the State argues that the trial court relied on items that were not introduced at the hearing on the petition. The State specifically challenges the trial court's reliance on the affidavits of Sabrika Lewis, Tyrus Duplesses,[13] Farrell Anderson,[14] as well as the polygraph examination results of Ballard.[15]

---

[13] With regard to the affidavits of Lewis and Duplesses, the trial court cited them in a footnote, stating:

> *State v. Ballard,* 325 So.3d 450 (La. App. 4 Cir. 07/21 /21 )(the district court must look at the specific claim and the specific evidence submitted in support of that claim to determine if the evidence is "newly discovered.")(The Fourth Circuit did observe that the district court did not err in finding claims based upon the affidavits of Mr. Duplesses and Ms. Lewis to be procedurally barred.)(Tyrus Duplesses asserted that he saw the relator after his arrest and observed the relator's swollen and injured groin area (and stated that the relator told him that he was beaten and forced to sign a false statement)—the witness to his whereabouts on the night of the crime apparently refers to the affidavit of Sabrika Lewis who claims that she saw the relator at a high school party several hours before the crime.) The affidavits of Sabrika Lewis and Tyrus Duplesses are both admissible in this case and were introduced to support Petitioner's alibi.

[14] The portion of the affidavit of Farrell Anderson, the trial court cited, stated that Williams borrowed his car the night of incident and that Ballard was not with Williams:

> 6. ... Sidney borrowed by car and left.
> 8. When Sidney left with my car, Quandreka Ballard was with him.
> 9.When Sidney borrowed my car that night, Jarvis Ballard was not with him.

[15] In its reasons for judgment, the trial court stated that Fourth Circuit in *Ballard* stated that the "polygraph results indicate[d] that [Ballard] was truthful when he denied that he was physically present during the attack, when he denied participating in the attack, and when he denied that he had ever been inside the victim's residence." *Ballard*, 2020-0617, p. 26, 325 So.3d at 470-71. The trial court acknowledged polygraph examinations are inadmissible in criminal trials, but noted that they may be used in post-trial proceedings. *See Ballard*, 2020-0617, p. 26, 325 So.3d at 471 ("although polygraph examinations are inadmissible in criminal trials, the reasons for excluding polygraph evidence in criminal trials are not necessarily compelling in post-trial proceedings, and, therefore, subject to certain guidelines, the decision to consider polygraph evidence in post-trial proceedings is within judicial discretion"). The trial court then found that the State failed to rebut "the conclusions reached by the Fourth Circuit" in *Ballard* and further

The State argues that the trial court should not have considered the affidavits of Lewis and Duplesses, because they were procedurally barred from consideration by this Court in *Ballard*. *See Ballard*, 2020-0617, p. 33, 325 So.3d at 474 (holding that "the district court did not err in finding that the affidavits of Sabrika Lewis and Tyrus Duplesses are procedurally barred from consideration"). The State also notes while the affidavits of Lewis, Duplesses, and Anderson were attached to the petition, there was no testimony from these individuals at the hearing, and that they consisted of "purely hearsay information."

Similarly, as to the polygraph examination of Ballard, which was an exhibit to Ballard's post-conviction application, the State notes that the person who conducted the polygraph never testified at the hearing and the polygraph results were not offered into evidence.

La. R.S. 15:572.8(D) of the Wrongful Conviction Compensation Statute provides that the trial court "may consider any relevant evidence regardless of whether it was admissible in, or excluded from, the criminal trial in which the petitioner was convicted."

The Second Circuit in *State v. Ford*, 50,525 (La. App. 2 Cir. 5/18/16), 193 So.3d 1242, 1248–49, found that the "unambiguous language of subsection (D) [of La. R.S. 15:572.8] indicates that the trial court is not constrained to a sterile examination of the testimony presented at the initial trial as it appears in the record." It further stated: "[b]ased on the clear statutory language, the entirety of the evidence, whether admitted at the underlying trial or excluded, is properly considered in the determination of factual innocence." As a result, the *Ford* Court

---

concluded that the polygraph evidence corroborated Ballard's assertion that the confession was coerced and that he was not present at the crime scene.

found the trial court was permitted to consider statements made by the petitioner to the "police during the investigation that was excluded from trial by motion to suppress" even though such statements were "not 'used in his original conviction.'" *Ford*, 50,525, p. 8, 193 So.3d at 1248.

Additionally, the Fifth Circuit in *State v. Alexander*, 2022-12, p. 14 (La. App. 5 Cir. 6/21/23), 367 So.3d 867, 879, the "statutory language [of La. R.S. 15:572.8(D)] reflects a legislative intent that *little limitation* be placed on the introduction of evidence related in any way to the convictions and the proof of factual innocence." (citing *In re Williams*, 2007-1380, p. 6 (La. App. 1 Cir. 2/20/08), 984 So.2d 789, 793) (emphasis added). The Court further stated that La. R.S. 15:572.8(F),[16] which provides the requirements for a petition for wrongful conviction compensation, "reflects a legislative intent that the factfinder have as much access as possible to whatever limited evidence may be available under the unique circumstances presented by a petition for compensation for wrongful conviction and imprisonment." *Alexander*, 2022-12, pp. 14-15 (La. App. 5 Cir. 6/21/23), 367 So.3d 867, 879. The *Alexander* Court thereafter found that an eyewitness identification expert's testimony, who reviewed the criminal trial testimony of petitioner, and DNA evidence, obtained years after the petitioner's conviction, was sufficient to establish that the petitioner was factually innocent. *Alexander*, 2022-12, p. 25, 367 So.3d at 886.

Further, the Louisiana Supreme Court in *State v. Stewart*, 2016-2154 (La. 9/6/17), 224 So.3d 985, indicated the trial court was not bound by the evidence

---

[16] La. R.S. 15:572.8(F) states: "The petition shall contain a recitation of facts necessary to an understanding of the petitioner's innocence that is supported by either the opinion or order vacating the conviction and sentence and/or by the existing court record of the case. Specific citations for each fact tending to show innocence shall be made to the existing record."

offered at the hearing on the wrongful conviction compensation petition. The *Stewart* Court partially granted writs and remanded the matter, directing the trial court to consider the "entirety of the record," including evidence submitted on post-conviction. The Louisiana Supreme Court stated:

> WRIT GRANTED IN PART. The district court ruling reopening this case for the receipt of additional evidence is set aside. On remand, the district court is not limited to consideration of the evidence presented at the hearing, but is instructed to consider the entirety of the record, including evidence previously admitted as part of defendant's post-conviction proceedings. In all other respects, the writ is denied.

While La. R.S. 15:572.8(D) liberally allows for the admission of any relevant evidence "otherwise inadmissible in the criminal proceeding" and Louisiana courts have declined to limit the trial court to a "sterile examination of the evidence," we need not reach a conclusion regarding whether it was appropriate for the trial court to consider the affidavits and polygraph examination. As discussed below, the evidence supports the trial court's conclusion that Ballard has established he is factually innocent even without the disputed exhibits.

Evidence of Factual Innocence

Finally, the State argues Ballard failed to establish by clear and convincing evidence that he did not commit the robbery and aggravated rape. The State notes that Ballard had confessed to the crime and that N.D. had identified him in both a photographic line-up and at trial. The State further claims the testimony of Williams, Pierre, and Quandreka "lacked any semblance of credibility and even directly contradicted other statements." Also, the State argues that the expert testimony offered by Ballard was "anecdotal" and none of the experts had spoken to any of the relevant individuals, such as the particular officers or the victim, prior to reaching their opinions. The State further asserts that in the 1998 DNA report,

27

there was some samples that contained the profile of an unknown donor and the 2018 DNA report did not conclusively exonerate Ballard. As such, the State claims that the trial court erred in granting the petition for wrongful conviction compensation.

However, we find that Ballard sufficiently established his factual innocence of the crime. The record shows that the DNA evidence excluded Ballard as a perpetrator to the crime. Montgomery, who co-authored the 1998 DNA report, testified that numerous items were tested, including the victim's bedding and underwear. While neither Williams nor Pierre could be excluded as contributors, Montgomery stated that none of Ballard's genetic material was found on the victim's belongings. The record shows that the only item upon which Ballard's DNA evidence was found was from his own sweatpants.

While there were partials profiles of an "unknown donor" present on some of the samples tested in the 1998 report, Montgomery-explained that this did not "implicate" Ballard. She stated that if none of the sampled donors (which included the victim, Pierre, Williams, and Ballard) matched the sample, she marked that the donor was unknown. Montgomery specifically testified that if she thought the unknown donor could have been Ballard, she would have indicated on the report Ballard "could not be excluded" as a contributor.

The 2018 DNA report, conducted by Nash, also excluded Ballard as possible contributor from the testable DNA. Montgomery testified that she could "confidently state" that Ballard's DNA was excluded in both reports, "with the exception of the sweatpants attributable to him." Nash also testified Ballard was excluded from the "items where we had comparable DNA" in the 2018 DNA report.

Further, both Williams and Pierre, the actual perpetrators of the rape and robbery, testified that Ballard was not involved in the crime.[17] Quandreka, who was in the vehicle during the incident, also stated Ballard was not present.

With regard to the State's suggestion that these witnesses lack credibility, credibility in this case is within the province of the trial court. Moreover, Pierre explained that he had implicated Ballard in his statement to the police under duress. Although the State notes that at no point prior to the trial on the petition did Quandreka assert Ballard's innocence despite the fact that the crime occurred in 1998; Quandreka indicated at the hearing that she was advised by her attorney not to testify at Ballard's trial.

As to Williams, the State notes that at the underlying trial, Williams's attorney stated that any testimony Williams would provide would be "unfavorable" to Ballard. However, the record shows that Williams himself had never implicated Ballard in the crime. In both his initial statement and at the hearing on the petition, Williams stated that Ballard was not present.

Additionally, the statements of Yolanda and Louis, the victim's next-door neighbors who observed the robbery, stated that they saw only two men and one girl at the scene. They both observed Pierre and another man running back and forth from the house and the car with the victim's belongings, and a girl, inside the car.

As to Ballard's confession, the State is correct in that Ballard signed a statement implicating himself, however, there was testimony that Ballard was coerced into and "at risk" of making a false confession. At his underlying trial,

_____

[17] *See Ballard*, 2020-0617, p. 2 n.2, 325 So.3d at 456 (stating the "DNA evidence in this case establishes that both of the [Ballard's] co-defendants assaulted the victim.")

Ballard testified that he was kicked in the groin by an officer during interrogation and ultimately gave a statement confessing he raped the victim because he was scared. The record shows that Ballard also alleged he was kicked and pepper sprayed during interrogation. Additionally, Pierre testified at the hearing that after Ballard was questioned by the police Ballard's face was dripping wet. Further, Dr. DeClue, the forensic psychologist, opined that Ballard was a "vulnerable suspect" who was more likely to give a false confession. While Dr. DeClue admitted he did not interview the police that interrogated Ballard, Dr. DeClue reviewed Ballard's statement, his school, juvenile, and medical records and testified about the various factors that would lead an innocent person give a false confession. He noted that the police interrogation, lack of procedural safeguards, and Ballard's learning disability could have caused Ballard to confess to a crime he did not commit.

With regard to the victim identifying Ballard as a perpetrator, Dr. Strange explained that various factors, including trauma, the presence of multiple perpetrators, suggestive procedures, and the passage of time, can influence memory and cause a false identification. Although Dr. Strange did not interview the law enforcement responsible for the photographic line-up, she did review the victim's statements, the photo arrays presented to the victim, and the trial testimony. In the victim's initial statement to the police hours after the incident, the victim only reported two perpetrators. Moreover, the victim provided the police with details as to which perpetrator did what. For example, the victim stated the man who was riffling through her dresser drawers directed the other man to rape her, which he did. The man "going through her things" then held a pillow over her head, demanded money, and then raped her. The victim's second statement, taken days after the assault indicated that three men were "possib[ly]" present only after

30

the police had suggested it. The victim does not describe the actions of a third perpetrator in this statement. Dr. Strange also noted that the photographic line-up presented to the victim was not double-blind, which could unintentionally lead a victim to identify a certain suspect. Moreover, the victim admitted at the underlying trial, that the photo array, wherein she identified Ballard, was dark and less distinct that the other photo arrays presented. Dr. Strange also noted that the photographic line-up, containing Ballard, was not of "good quality." Dr. Strange's testimony and the circumstances surrounding the victim's statements and identification is sufficient to show the victim misidentified Ballard.

In sum, we find that the record supports the trial court's conclusion that Ballard was not involved in the assault and robbery of the victim. The DNA evidence excluded Ballard as a perpetrator. Also, the admitted perpetrators of and accessory to the crime stated Ballard was not present during the incident. The victim's neighbors observed only two men enter the victim's residence and the victim initially only identified two assailants. Further, there was evidence that the police made suggestive statements during the interview with the victim, wherein she identified a possible third suspect. Additionally, the testimony of Pierre and Ballard indicated that Ballard was threatened and injured during his interrogation. Moreover, Dr. Strange and Dr. DeClue testified regarding the factors leading to eye witness misidentification and false confessions, some of which were present in the matter at hand. Furthermore, it well established that the trial court is afforded great discretion in its findings of fact. As such, we find that the trial court was not manifestly erroneous in finding Ballard established his factual innocence of the crime by clear and convincing evidence.

**CONCLUSION**

For the abovementioned reasons, we affirm the trial court's judgment granting Ballard's petition for wrongful conviction compensation.[32]

**AFFIRMED**